Clarence Patrick **GALLAGHER**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 19233.

United States Court of Appeals Eighth Circuit.

Jan. 24, 1969.

Albert A. Wolf, of Wolf, Glaser & Milhollan, Bismarck, N. D., for appellant.

Gary Annear, Asst. U. S. Atty., Fargo, N. D., for appellee; John O. Garaas, U. S. Atty., on the brief.

Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.

GIBSON, Circuit Judge.

The defendant Clarence Patrick Gallagher was convicted in a jury trial of robbing the federally insured State Bank of Burleigh County, Sterling Exchange, of Sterling, North Dakota, in violation of 18 U.S.C. § 2113 and was sentenced to ten years imprisonment.

On appeal he raises three issues: (1) insufficiency of the evidence, (2) failure of the court to sustain his motion to suppress evidence found in a search of defendant's automobile, and (3) the maximum penalty set forth under § 2113 as contrasted with other sections of the Criminal Code (not denominated), which he alleges carry a five-year maximum penalty, is discriminatory. We affirm.

## THE EVIDENCE ISSUE

That the Bank in question was robbed is conceded and the evidence placing the perpetration on the defendant is overwhelming. The record shows that the defendant on August 4, 1967, the day of the robbery, drove to a bar just north of Sterling, North Dakota, operated by Lorraine Severson, in a light blue colored car with a pinkish-red or rose colored blanket over the trunk. He stayed at the bar about ten minutes, consumed two beers and left in the direction of Sterling. His car was observed both in the vicinity of the bar and parked across from the Bank with the same pink or coral blanket on the trunk. The left-hand fender and bumper on his 1966 Ford convertible were damaged, which fact was noticed prior to the robbery.

At about 12:45 or 12:50 p. m. Rosella Selland and Beverly Olson, employees of the Bank, saw a person come into the Bank. Mrs. Selland, a teller, went over to wait on that person and noticed that he had a gun in his hand pointed at her. He pushed a crumpled paper sack on the counter and a note stating "This is a holdup and give me your money." She stacked the money on the counter and

put it in the sack with the note; $3650 was taken in the robbery. Mrs. Selland also noticed a light blue car parked by the Bank during the course of the robbery. The robber told Mrs. Selland and Mrs. Olson to go in the other room and to lie down on the floor. Immediately after partially following directions, they went to the door and saw the light blue Ford going around the corner headed north. The bank robbery was reported within minutes. Another person not in the Bank, Elizabeth Rippley, observed the light blue bottom and ivory top convertible parked on the north side of the Bank. She saw a man getting out and going into the Bank and then later she observed the car driving away with only one person in it and that person looked like the defendant. The car had a dark rose colored blanket on the trunk. This car was observed by another party, Duane Murray, heading north from Sterling at a high rate of speed, the red canvass or cloth flapping on the trunk. This same convertible driven by defendant pulled into a gasoline station at about 2:00 p. m. at Wing, North Dakota, which is about 22 miles from Sterling. The defendant had the car filled up with gas, asked directions and appeared to be in a hurry or jumpy.

Patrolman Angh of the North Dakota State Highway Patrol, at about 1:15 p. m., received word that the Bank in Sterling had been robbed and he was given a general description of the vehicle used in the robbery. The description was of a convertible, either light blue or light green, with a white top and with the trunk lid missing. After driving about 19 miles toward Tuttle he received a radio message from the State Patrol aircraft that there was a car to his left in the ditch matching the description of the car used in the bank robbery. After turning around on the highway to approach the car, the car pulled out on the

highway and headed south. A high-speed chase, at speeds up to 110 miles an hour, ensued for approximately 12 miles. The pursued car was then stopped and the defendant was placed under arrest for driving while under the influence. Other officers arrived shortly after the arrest and the trunk of the defendant's car was opened to see if there was another person in the car. Discovering no one else in the car or the trunk, the defendant's car was taken into Steele, North Dakota, as was the defendant. The defendant's car had a damaged left rear fender similar to the description given previously by witnesses observing the car in Sterling. The defendant was taken to the County Court House and given a breathalyzer test at 4 p. m. that day, which test showed an alcoholic blood content of .11, sufficient under the North Dakota statute to constitute driving under the influence.

FBI Agent William Willis, after receiving a call about 2 p. m. on the bank robbery, made an investigation of the details, talked to other officers about the case, and made application for a search warrant with a local municipal judge. The search warrant was obtained and defendant's car was searched by the sheriff of Kidder County with the assistance of FBI agents, including Mr. Willis. Under the floor mat in the right-hand seat area $1,000 was found and a search of the trunk of the car revealed $1990 in United States currency and $222 in Canadian currency located in the convertible boot case. An additional $439 was found on defendant's person. These funds approximated the $3650 taken in the bank robbery. Also found was the colored blanket or bedspread in the trunk of the vehicle and a pink blanket in the back seat area. Seventeen hundred dollars of the funds taken from the defendant's car were identified as being bills taken in the robbery.[1]

1. Mrs. Selland identified: $500 in 20's secured by an identifiable wrapper; a $5 mutilated bill; a torn $1 bill; two $2 bills; some one dollar silver certificates, separately cached and being saved as collector's items; $1050 in hundred dollar and fifty dollar bills; mutilated Canadian $2 bill; older $10 bills that were in with the mutilated currency; other identifiable bills and batches of 5's, 10's and 20's that were clipped together with a paper clip according to the practice of the Bank.

Mrs. Selland and Mrs. Olson separately were brought into a room in which the defendant was present with other persons and identified him as the person who had robbed the Bank. They also identified him at the time of trial.

The defendant took the stand and testified he had won some money in Reno, Nevada, and also had met a casual acquaintance there who had borrowed some $1200 from him to use for gambling. Although the defendant took rings as security for the loan, he agreed to drive the borrower, whom he thought was named Allen Gray, back to Minneapolis to get funds to repay the loan. While enroute to that general area Gray told him he was planning on buying a farm 5 miles south of Wing, which is about 22 miles north of Sterling. Gray fortuitously met a woman in Bismarck, whom he referred to at various times as his wife, his ex-wife or girl friend. Gray told the defendant to meet him at the vacant farm place. The defendant did so and while there Gray asked to use the defendant's car, stating he would run over to his brother-in-law's place and get the money to repay the loan. Gray now had his own car but did not want to take it, allegedly stating he did not want his brother-in-law to know that his wife was down there. The defendant let Gray borrow his car while he stayed there at the farm with Gray's wife and drank beer. Gray returned in about an hour and 15 or 20 minutes and gave some money to his wife, who counted some of it out and gave it to the defendant. He placed it in the trunk or in the convertible boot of the car. He testified the $1,000 he had under the floor mat of the front seat was his own money but this particular money was identified as coming from the bank holdup. Defendant denied that he ever owned a pistol or that he had ever had a pistol in his hand. He denied being in Mrs. Severson's bar close to Sterling and also said he did not remember taking the breathalyzer test. Defendant further testified that he wasn't working when he left the State of Washington.

The thrust of defendant's claim that the evidence is insufficient is directed towards the identification of defendant as the perpetrator of the robbery. Defendant complains that Mrs. Selland, the teller, Mrs. Olson, the bookkeeper, and Mrs. Severson, the tavern operator, all of whom positively identified the defendant, did not give a graphic description of him. Mrs. Selland and Mrs. Olson were taken to view the defendant around 3:30 or 4:00 p. m. that same day, shortly after his apprehension. They apparently viewed him individually in a room in the Kidder County Court House that was occupied by other persons, some in uniform and some in working clothes. Neither Mrs. Selland nor Mrs. Olson had any hesitancy in picking out the defendant as the person who held up the Bank. It was necessary, of course, at this stage to secure identification in order to ascertain whether the authorities had apprehended the person who had committed the crime. If another person had committed the holdup, sound investigative practices would dictate that the search and investigation continue. Positive identification was likewise made at the trial. The defendant denied being in Mrs. Severson's tavern before the holdup but her identification in regard to that incident was positive. Defendant even complains that Galen Zerr, the service station attendant who observed the defendant after the holdup at a place where the defendant admitted he had stopped for gas and seen Zerr, did not give a description of him. These objections are without merit, as most persons immediately after or a short time after viewing a person, particularly under circumstances that occasion an interest in his appearance, are able mentally to photographically recognize that person. The defendant did not even request any statements that might have been made by the witnesses under the Jencks Act, 18 U.S. C.A. § 3500, and relied without success on vigorous cross-examination to shake the testimony of the identification witnesses.

Defendant's reliance on Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199 (1967), is misplaced. That case refers to the practice of showing suspects singly for the purpose of identification and under the particular circumstances in which the suspect was brought to the hospital to be confronted by the surviving victim. Even there a majority of the court held there was no denial of due process since the surviving victim, widow of the deceased victim, was the only person who could exonerate the suspect and she could not go to the police station for the usual lineup because of her physical condition—and there was some question about how long she would live. Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968) likewise is no authority for defendant's contention. That case was an affirmance by an equally divided court without opinion, except for a dissent.

■ Even under the rule that identification procedures "must be evaluated in light of the totality of surrounding circumstances" mentioned in Simmons v. United States, 390 U.S. 377, 383, 88 S.Ct. 967, 970, 19 L.Ed.2d 1247 (1968), the defendant is not benefited. As pointed out in *Simmons*, a case involving pretrial initial identification by photographs, each case involving identification must be considered on its own facts. The Court reasoned at 384, at 971 of 88 S.Ct.:

" * * * [W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in Stovall v. Denno, 388 U.S. 293, 301–302, [87 S.Ct. 1967, 1972–1976, 18 L. Ed.2d 1199], and with decisions of other courts on the question of identification by photograph."

■ The identification procedure followed was proper and not impermissibly suggestive; and the evidence convincingly points to the defendant as the offender. He admittedly was in the area at the time and his car was concededly used in the robbery. In addition the loot from the holdup was found in the defendant's car and on defendant's person. While not all of the currency could be identified bill by bill, sufficient amounts thereof were identified so as to place defendant in possession of the loot. Also the identifiable $100 bills and $50 bills found under the front floor mat of the car were identified as taken from the Bank, and defendant by his own testimony convicted himself by stating that that particular money was received from a gambling casino in Reno. His testimony in his attempt to exculpate himself from the crime was not at all persuasive. The jury considered all the evidence and the credibility factors were for its determination. The evidence readily supports the submission of the case and the jury's determination.

## SEARCH OF DEFENDANT'S VEHICLE

The defendant raises no question concerning his arrest but contends the arresting officers should not have searched the trunk of his vehicle at the time of the arrest. State Patrolman Angh, after pursuing the defendant for 12 miles up to speeds of 110 miles an hour, with his red light flashing and the siren sounding, stopped the defendant, thought he was under the influence of alcohol, arrested and handcuffed him. The officers stated they wanted to look in the trunk of the car to see if any other person was in the trunk. The trunk was locked and defendant told them the key was in his pocket. The patrolman got the key out of the defendant's pocket, opened the trunk and found, according to the patrolman's testimony "nobody * * * or nothing in there."

■ The car was then taken into Steele where a search warrant was ob-

tained on the basis of an affidavit signed by an FBI agent who had made an investigation of the robbery and had talked with other enforcement officers having connection with the investigation.[2] Having apprehended the defendant as a suspect in the robbery while driving the car which was used in the holdup, it would appear axiomatic that a search for the tools and loot of the crime would be made at the earliest possible moment.[3] It does not appear that the trunk of the car was searched for any loot and there is no showing that any of the loot was visible when the trunk was opened. A search pursuant to the warrant revealed, under the floor mat of the front seat, $1,000 of the money identified as coming from the Bank. Some $1990 was recovered in the convertible boot in which the convertible top would be secured when not in use and the balance of some $400 was found on defendant's person, including Canadian money that reasonably could be believed to be part of the Bank loot. While defendant points out the constitutional guarantee against unreasonable search and seizure under the Fourth Amendment to the Constitution of the United States extends to the innocent and guilty alike, Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the standard is still reasonableness. In this case the search was not only reasonably dictated by the circumstances of the holdup and subsequent apprehension, but probable cause for the issuance of the search warrant appears evident.

Defendant claims that probable cause was lacking because the testimony given in support of the petition for the search warrant was entirely hearsay. At this point in the development of jurisprudence interpreting the Fourth Amendment, a claim that a search warrant is invalid because it is based entirely on hearsay is frivolous. Many of the important decisions in all phases of human activity must by the necessity of time and availability be based on hearsay. Particularly is this true in the now complex field of criminal investigation. Authorities must act and move swiftly to apprehend offenders who are escaping from the scene of the crime with the ill-gotten loot. Unless authorities do act quickly upon an evaluation of reports received by them, the fruits of the crime and the trail of the offenders could easily be irretrievably lost. The evidence in support of a search warrant may be entirely hearsay or otherwise incompetent. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Hodgdon v. United States, 365 F.2d 679, 684 (8 Cir. 1966). In this field we are dealing with probable cause and not with the more onerous burden of proving guilt beyond a reasonable doubt. As noted by Mr. Justice Frankfurter in Jones v. United States, 362 U.S. 257, 269, 80 S. Ct. 725, 735, 4 L.Ed.2d 697 (1960): "An affidavit is not to be deemed insufficient on that score, [hearsay] so long as a substantial basis for crediting the hearsay is presented."

2. The application for the search warrant stated that the agent had probable cause to believe and did believe that approximately $3700 in currency stolen from the Bank, together with a gun, hat, khaki shirt and red blanket all used in the commission of the felony, were in the automobile found in the possession of the defendant, giving a satisfactory description of the car. The grounds for his belief set forth the fact of the robbery and that the defendant had been tentatively identified by Rosella Selland and Beverly Olson as the person who robbed the Bank and that the described automobile was also tentatively identified as the automobile being driven by the robber. The

apprehension of defendant was also noted in the affidavit.

3. It appears that the officers upon arresting the defendant for suspicion of bank robbery would have the right to search his car under the doctrine that a lawful arrest will support a properly limited incidental search. Sumrall v. United States, 382 F.2d 651 (10 Cir. 1967); Mendoza v. United States, 365 F.2d 268 (5 Cir. 1966). We need not reach this point however as nothing was seized from the trunk when it was opened nor is there any showing that any of the loot was visible upon a mere inspection of the trunk made by officers to ascertain whether another person was in the trunk.

As was stated by the Supreme Court in Brinegar v. United States, 338 U.S. 160, 173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879 (1949), "There is a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them." Hearsay may thus be the sole basis for issuance of a warrant "so long as there [is] a substantial basis for crediting the hearsay." Jones v. United States, 362 U.S. 257, 272, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960).

The only meritorious question that can arise in this connection is whether a "substantial basis for crediting the hearsay" has been presented to the issuing officer. Recognizing that the essential criterion for the issuance of a warrant is whether there is probable cause to support it, the Supreme Court in Aguilar v. Texas, supra, said at 114 of 378, U.S., at 1514 of 84 S.Ct., that while hearsay may be the sole evidentiary support for the issuance of a search warrant, the issuing officer:

> " * * * [M]ust be informed of some of the underlying circumstances from which the informant concluded that the narcotics [in that case] were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, * * * was 'credible' or his information 'reliable'."

Though hearsay, it is clear that the representation made herein, (see footnote 2, supra) meets the criteria established in *Aguilar* of explaining the underlying circumstances upon which the hearsay declarants (Mrs. Selland and Mrs. Olson) based their conclusions and of explaining the basis upon which it was decided that such informants were themselves reliable.

Without going into detail, it is also patently obvious that the representations made by the FBI agent in the present case were far more detailed and complete than those made in *Aguilar* in which the Supreme Court found that the search warrant had been improperly granted. There, the officer petitioning for the search warrant, told the magistrate only that information from a reliable informer indicated that narcotics were being illegally possessed and sold at a certain address. No information was presented indicating the informant's basis for the charge nor the officer's basis for crediting the unnamed informant. In the case at bar the named informants were witnesses to the bank holdup and their reliability is apparent upon the record.

In addition, the representations made herein, in support of the petition for a search warrant are clearly as substantial as those made in United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), in which the Supreme Court found that issuance of a search warrant based essentially on hearsay evidence was nevertheless proper because there was a substantial basis for crediting the hearsay. The search warrant in the present case was properly granted.

Defendant questions the search warrant being issued by a police magistrate rather than a federal court but cites no support for his complaint. A police magistrate has authority under §§ 29-29-01 and 29-29-03 of North Dakota Century Code to issue a warrant upon probable cause, supported by affidavit. The search warrant issued and the car searched were both within the jurisdiction of the police magistrate.

## PENALTY RANGE ISSUE

Defendant's last point is that 18 U.S.C. § 2113(a), carrying a range of penalty up to twenty years for bank robbery or robbery of a federally insured bank or saving and loan association, is inconsistent with other provisions of the Code that set forth a maximum penalty of five years for stealing from a federally insured establishment. The defendant cites no other Code section so holding and though we believe that there are wide ranges of penalties in the various criminal statutes enacted by Congress, we do

not think the point is sufficiently well taken to merit any further discussion. In the first place defendant Gallagher has been found guilty not of mere theft or "stealing", but of robbery, a distinctly more serious offense. It is true that defendant was acquitted of the even more serious offense of robbery with a deadly weapon, but nevertheless his actual conviction of bank robbery cannot be equated with mere theft. It is an error in logic to condemn a statute (18 U.S.C. § 2113) on the ground that it establishes a punishment different from and greater than that found in other statutes dealing with like offenses, when in fact the group of statutes pointed to as establishing lesser penalties deals with different and lesser offenses. Secondly, what constitutes any particlar offense and the range of penalty for that offense is a matter particularly within the jurisdiction and province of the legislative branch of our form of government. This principle has been recognized since the earliest days of our republic. In United States v. Wiltberger, 5 Wheat. 76, 5 L.Ed. 37 (1820), Chief Justice Marshall said at page 95, "[it is a] plain principle, that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime, and ordain its punishment." This doctrine has not been eroded by changing times and still stands as a viable constitutional principle. Yates v. United States, 354 U.S. 298, 304, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957).

When the Congress sets forth various penalties under different criminal statutes, the courts are not concerned with the policy of Congress in the variations prescribed as penalties for particular proscribed acts. That is strictly a legislative matter, absent a constitutional issue such as cruel and unusual punishment which ostensibly is not present in this case. The courts are concerned in ascertaining that a sentence falls within permissible statutory limits. The sentence in question meets that criterion.

Judgment affirmed.