**Albert Darrell JONES, Petitioner,**

v.

**DIRECTOR, PATUXENT INSTITUTION, Respondent.**

**Civ. A. No. 70–1061–W.**

United States District Court,
D. Maryland.

Dec. 1, 1972.

Charles F. Morgan, Asst. Director, Prisoner Assistance Project, Legal Aid Bureau, Inc., Baltimore, Md., for petitioner.

Francis B. Burch, Atty. Gen., and John P. Stafford, Jr., Asst. Atty. Gen., Baltimore, Md., for respondent.

WATKINS, District Judge.

## OPINION AND ORDER

Petitioner, presently a patient at Patuxent Institution, Jessup, Maryland, seeks habeas corpus relief in this Court.

Two petitions were submitted to this Court requesting relief for Jones. The petition as submitted by Jones, pro se, alleged two conviction issues—tainted identification and prejudicial remarks—along with numerous claims pertaining to his confinement. The petition submitted on Jones' behalf by the Legal Aid Bureau did not refer to any confinement issues but rather was limited to the conviction issues just stated. On January 3, 1972, the law clerk for this Court received from Jones a letter stating "that I want to withdraw all Petition and papers Concerning the Patuxent Instituion *only.* Mr. Dibble now I pray that this Court will hear my Petition Concerning my original Conviction the issue in that Petition are (1) tainted identification (2) prejudicial Statement." Accordingly, this Court will construe the letter as a final amendment to the original petition—already amended numerous times by Jones—and will limit the discussion to the two conviction claims set out above.

Petitioner was convicted in the Criminal Court of Baltimore, Maryland, before Judge Solomon Liss and a jury in a trial on October 20–25, 1969 and sentenced to serve 10 years. On direct appeal, petitioner (among other things) claimed, as he does here, (1) that the two judicial identifications were so tainted by pretrial confrontations of him by the identifying witnesses as to render the in-court identification inadmissable and (2) that certain remarks of the trial judge were so prejudicial as to necessitate a new trial. The Court of Special Appeals of Maryland found that petitioner's pretrial motion to suppress the judicial identification was denied and that when the identification evidence was introduced at trial no objection was made. With the case in this posture

that Court found the question of admissability to have been waived. As to any prejudicial remarks made by the trial judge,[1] the Court of Special Appeals found no error since "appellant received everything of the trial court that he requested and there is nothing before us preserved for review. Rule 1085. In any event in the light of the prompt caution of the jury we see no prejudice." Jones v. State, 9 Md.App. 455, 460, 265 A.2d 271, 274 (1970).

## THE ALLEGED PREJUDICIAL REMARKS

■ This Court concludes on the entire record that the findings of facts and conclusions of law by the Court of Special Appeals are correct with respect to any alleged prejudicial remarks made by the trial judge. For the law to be different would certainly be an anomaly since it would afford the defendant the opportunity "to have his cake and eat it too." The defendant could reject the trial judge's overtures for a mistrial after a possible judicial misstatement and instead request cautionary instructions to the jury, but then, if the verdict was unfavorable he could seek to have it reversed based upon the alleged prejudicial remarks. This would place the defendant in the all too favorable position of gambling on the first trial knowing that if he loses he will have a second. See Terry v. Peyton, 433 F.2d 1016, 1020 (4 Cir. 1970) (a habeas corpus proceeding is not "an opportunity to challenge evidence and tactics earlier deemed by trial counsel to be unobjectionable and sound".) ; United States v. Gomez, 457 F.2d 593 (4 Cir. 1972).

## THE IDENTIFICATION—PETITIONERS' CONTENTIONS

At first glance, dismissal of the claim of an alleged tainted judicial identifica-

1. THE COURT: Incidentally, if anybody bothers you because of the testimony that you have given, you come in here and let Mr. Harlan know.
THE WITNESS: Yes, sir.
MR. HARLAN: Thank you.
(Witness excused.)

. . . . .

MR. GERTZ: If your Honor pleases, I don't know whether or not the jury would take from that remark that any threats were made or anything of that order. This was not so.
THE COURT: Well, I'm not suggesting that there were. I'm only saying that for the protection of this witness, if anybody disturbs him, I want to know about it.
MR. GERTZ: No, if your Honor pleases—this may be prejudicial to the jury.
THE COURT: Let me see counsel for a moment, please.
(Whereupon, a Bench-Bar Conference was held out of the presence of the jury as follows:
THE COURT: The only thing that I said to this boy was that if anybody bothered him because of his testimony, he was to let Mr. Harlan know. Now, you have made a big deal about it. You have now called it to the attention—well, do you want a mistrial?
MR. GERTZ: No, I don't want a mistrial.

THE COURT: What do you want?
MR. GERTZ: Just the fact that there were no threats or anything made to this witness.
THE COURT: All right. I will tell the jury about that.
MR. GERTZ: Because I raised the question, because this kid was the one who said he could get him a hundred and twenty years.
MR. HARLAN: Your Honor and Mr. Gertz, I make the point, also, that this testimony was brought out by the Defense Counsel, not the State. In fact, we have no knowledge of it, whatsoever.
(Whereupon, the Bench-Bar Conference was concluded.)
THE COURT: Members of the jury, so there will be no misunderstanding, I want to be certain that you do not take any implication from my statement to the youngster who has just left that there had been or might be any threats against him. He is a young man, and I merely advised him that in the event that there was any repercussion, he was to let Mr. Harlan know. Now, that doesn't mean that there has been any threat, nor does it mean that there is any suggestion of prejudice against the defendant as to this particular matter. So, you are to disregard that particular phase of the case. All right. (Tr. 191–193).

**918**

tion does not lend itself to an easy solution. With respect to this claim, petitioner contends, generally:

"that (1) the testimony of Mrs. Anjulis and Mrs. Patti that they had identified Petitioner at the preliminary hearing should have been *per se* excluded and that (2) the judicial identification by Mrs. Anjulis and Mrs. Patti should also have been inadmissible in evidence absent the government's showing of an independent source or harmless error. Petitioner's claim is based on the fact that under all of the circumstances surrounding it, the pre-trial confrontation at the preliminary hearing was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny Petitioner due process of law." Petitioner's brief as submitted by Legal Aid at p. 11.

"Furthermore, the State can show no factors which could support a finding that the identifications by Mrs. Anjulis and Mrs. Patti had a source independent of the illegal preliminary hearing. See United States v. Wade, *supra* [388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149]. Finally, it cannot be argued that the admission of the identification evidence was 'harmless error' since the only evidence introduced that is sufficient to support a conviction was the identification of Petitioner by the two bank tellers. See Chapman v. California, 386 U.S. 18 [, 87 S.Ct. 824, 17 L.Ed.2d 705] (1967)." Petitioner's brief as submitted by Legal Aid at 18.

An examination of the brief as submitted by Legal Aid's Prisoner Assistance Project discloses that this Court must consider eighteen issues:

(1) that it is "likely" that the photograph of petitioner was among those photographs shown to the tellers;

(2) that the tellers "collaborated" prior to giving their testimony about the lineup, and that neither teller could explain her failure to identify the petitioner in the lineup;

(3) that the trial judge at the suppression hearing apparently "analogized what happened at the preliminary hearing to a lineup" in that there were several black men before the judge at the preliminary hearing when the petitioner was identified and that this was similar to a lineup;

(4) that the identification was improper since it was based on a single physical characteristic;

(5) that with respect to Mrs. Patti's identification an unfair confrontation took place and the State intended that an identification be made since the State was saying at the preliminary hearing "that's the man";

(6) that petitioner was prejudiced by being brought to the preliminary hearing in custody;

(7) that Mrs. Patti's testimony about a "goatee" on petitioner indicates a misidentification;

(8) that there are dangers when a long period of time has elapsed between the robbery and the identification;

(9) that the observations that Mrs. Patti and Mrs. Anjulis had of the robber make it unlikely that either of them could recall his appearance three months later;

(10) that the totality of the circumstances prejudiced Mrs. Patti's pretrial and in-court identification;

(11) that it is improper to allow a conviction to stand where one of two eyewitnesses' testimony was improperly admitted;

(12) that Mrs. Anjulis' testimony concerning the pretrial identification was improperly admitted;

(13) that Mrs. Anjulis' confrontation with the petitioner at the lineup and preliminary hearing was unconstitutional and that the time delay between the robbery and the identification was too long and that she did not have an adequate observation of the robber;

(14) that Mrs. Patti pressured Mrs. Anjulis into identifying petitioner;

(15) Mrs. Anjulis' in-court identification was unconstitutional;

(16) that, if the Court of Special Appeals for Maryland had not concluded that petitioner waived the identification claims and had considered the merits of the case, it would have found the pretrial identification to have been improper;

(17) that the State can show no factors which could support a finding that the identifications made by the tellers had a source independent of the pretrial confrontations; and

(18) that it cannot successfully be argued that the admission was harmless error.

## THE IDENTIFICATION— SUMMARY

In support of his claim of a tainted judicial identification, petitioner has submitted his copy of the transcript of the pretrial evidentiary hearing to suppress the in-court identification, and the trial transcript. This Court has read the transcripts and finds as a fact and concludes as a matter of law that petitioner received a full and fair evidentiary hearing and, for the reasons hereinafter stated, the record contains substantial evidence fully supporting his convictions. Boblit v. Warden, Maryland Penitentiary, 350 F.Supp. 768 (D.Md. 1972). Therefore, this allegation is without merit.

Briefly, the petitioner contends that any identification testimony at trial was tainted by two pretrial confrontations he had with the two bank tellers, Mrs. Anjulis and Mrs. Patti, of the bank he is accused of robbing. The first confrontation occurred at his lineup conducted on the evening of his arrest, three and a half months after the robbery. Mrs. Anjulis failed to identify him and Mrs. Patti identified someone else. The following morning at the preliminary hearing Mrs. Patti identified petitioner spontaneously as he was brought in custody into the courtroom and Mrs. Anjulis first recognized him when he was before the judge for the

hearing. Both witnesses later identified petitioner at trial where a boy, William Silver, testified that he saw Jones shortly after the robbery drop a quantity of money on the ground when the petitioner was asking three men from Morton's Movers for a ride. Some of the money was later recovered by the police from the boy and the three men and it was identified as part of that stolen from the bank. On these facts petitioner contends that the pretrial identifications were so impermissibly suggestive as to deny him due process of law.

■ Under circumstances where the petitioner has been given an opportunity in state court to assert his claims on direct appeal and/or through post conviction procedures with findings of fact and conclusions of law being made by those courts, it would normally not be necessary in a federal habeas corpus opinion, where the state courts were correct in their determination, to laboriously reiterate the required finding of fact and conclusion of law other than in a summary manner. However, Jones has not had an opportunity to have the constitutionality of his identification determined on the merits by a state court, except by the trial court during the suppression hearing, due to the finding of a waiver by the Court of Special Appeals of Maryland. Accordingly, this Court has made a thorough analysis of the record and the law, as set out hereinafter, and has disposed of the petition on the merits thereby making it unnecessary to determine whether or not petitioner has deliberately by-passed state procedures in such a manner as would bar federal habeas corpus relief pursuant to Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) and Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965).

## THE IDENTIFICATION—THE FACTS

Specifically, the facts surrounding the pretrial confrontations are, for the most part, undisputed since they were diligently probed at a pretrial suppression

hearing. On November 5, 1968, at approximately 12:55 p. m. the Provident Savings Bank, located at 1100 South Charles Street in Baltimore City, was robbed of about $3,079.00 by a black male. The robbery was witnessed by two tellers, Frances Anjulis and Mary Ann Patti. Mrs. Anjulis testified that the defendant, who was apparently standing in line behind the customer she was waiting on, came up to the window, whereupon she observed him for the first time, and he presented her with a brown paper bag and a note demanding money. (Tr. at 13). Mrs. Anjulis responded by returning the bag, note and $3,-079.00, with some of the latter having been previously marked. She testified that during the transaction, which took about two minutes, she looked at him full in the face and that during this time she noticed that he was clean-shaven, had peculiar eyes and wore casual clothes with, as she thought, a black sweater.

Further, on the night of the robbery Mrs. Anjulis was shown apparently ten photographs but was unable to identify anyone as being that of the robber. It is unclear from the transcript whether the defendant's picture was among those displayed. The prosecutor said it was not while defendant's attorney stated that "I think it will be developed through the police, through the pictures that have been submitted". (Tr. at 28). Unfortunately, as discussed more fully later, no further proof was offered by either side pertaining to the contents of the group of photographs shown.

Three and a half months after the robbery, on February 14, 1969, a Friday night, Mrs. Anjulis attended a lineup but was unable to identify the defendant even though he was a participant, and she was able to face the petitioner in a lighted area for three to five minutes. (Tr. at 13–23, 34–35). However, she was able to identify the defendant at the preliminary hearing conducted the following morning on February 15, 1969, and at trial eight months later on October 20 and 21, 1969. When asked at the suppression hearing why she was unable to identify the defendant at the lineup, she stated (Tr. at 23–25):

"A. I had never been in a lineup before, and we had worked late that day, and I guess I was nervous. I had went down there, and I had never been in a lineup, and I didn't know what to expect. They said go in this room. I didn't know what—I guess I was just confused, I don't know. I was just real nervous. I didn't know what to expect. And I guess I just didn't see anything. And I felt like I wasn't—I wanted to be sure what I was doing. And I didn't even know about this until later, that I had to go to it the next day. This was all new for me.

But, I had never been in a lineup before in my life. I didn't know what I was going to go to. I had no idea.

Q. Now, do you base your identification of this defendant, today, on the fact—

MR. GERTZ: Objected to.

MR. HARLAN: This is a proper question, your Honor.

MR. GERTZ: Do you base?

THE COURT: Well, the question hasn't been asked, so I can't tell whether it is proper or not.

MR. GERTZ: Go ahead.

BY MR. HARLAN:

Q. Do you base your identification of the defendant, today, your in-court identification, on the fact that this was the same man that you saw in the bank in November of 1968?

A. Yes, sir.

MR. GERTZ: Objected to.

THE COURT: Overruled.

MR. HARLAN: Witness with you."

The explanation was further enhanced at the trial (Tr. at 147 to 150):

"Q. You viewed four men in the lineup and you could not identify Mr. Jones as one of the men, is that correct?

A. I didn't identify anyone.

Q. Right. Now, did the men face you full view?

A. Yes.

Q. Did the men face you side views?

A. Forward—I just looked up at them.

Q. Yes.

A. They were like up high.

Q. Yes. Well, they also turned the men sideways for you to look at them side view, didn't they?

A. No. They just had these floodlights on. They had these bright lights, and I looked up at them.

Q. They had the bright lights shining right on the men?

A. Yes.

Q. And you looked at them, and you could not identify anyone?

A. That's right, sir.

Q. Did you look into the eyes of all of these people?

A. I don't quite understand.

Q. I say, these four people—

A. No, I didn't look in the eyes.

Q. —did you look at their eyes? Did you look into their eyes?

A. Sir, that was a Friday evening. We had worked hard all day—

Q. I'm not asking you that.

MR. HARLAN: Excuse me, your Honor—could she finish her answer?

THE COURT: Let her finish her answer, Mr. Gertz. Go ahead.

THE WITNESS: We had worked all day and worked until 8:00 o'clock that night. I was told that we had to go to a lineup. I had never been to a lineup. I didn't know what to expect. I walked into this room—I didn't know what was coming off. It was just one of those things, I didn't see anybody.

BY MR. GERTZ:

Q. You were told that you were going there to identify, if you could, the man who gave you that note?

A. The only thing they told me, that I was going to a lineup.

Q. All right.

A. And I didn't know what a lineup was.

Q. All right. And you have told us that the only thing you remember about the man who gave you that note was the man's, 'eyes,' is that correct?

Q. And if you were going in there to try to identify the men that were being displayed before you in the lineup, wouldn't it not have been important for you to look at the men's eyes? Did you look at the men's eyes?

MR. HARLAN: Your Honor, it is not what would have happened. That is another question. She said she didn't—she was nervous and—

THE WITNESS: I was very upset.

THE COURT: This is cross-examination. Let her answer the question.

THE WITNESS: I was upset. I didn't know what to expect. I was going in this room—I didn't know.

BY MR. GERTZ:

Q. Well, you were going in there to identify someone, weren't you?

A. Yes. That is what they said I was going in for.

Q. All right. And the only means of identification you had was the person's eyes, wasn't it?

A. I said if I saw—I didn't see the man. I just didn't see him. I mean, if you didn't see him, you didn't see him. I'm just being very honest about it.

Q. All right. The question that I'm asking you, Mrs. Anjulis—I'm not trying to upset you—is—

THE COURT: Mr. Gertz, you have asked this question three times, and the lady has said she did not see the man.

MR. GERTZ: The lady has answered it, if your Honor please—

THE COURT: And she did not look particularly at the eyes, because she was upset. Now, I don't know why we have to belabor that.

MR. GERTZ: All right."

The circumstances surrounding Mrs. Anjulis' confrontation with the petitioner at the preliminary hearing are not entirely clear. She testified that she did not discuss the case with anyone prior to the hearing. (Tr. at 36, 46). Further, at the hearing there was a forty-five minute delay before their case was called during which time defendants in other cases were brought into the hearing room prior to petitioner while Mrs. Anjulis and Mrs. Patti sat there observing. When the petitioner was escorted in, Mrs. Anjulis testified that she did not "notice" him at that moment and that it was not "until he [petitioner] got up front, and they said my case was coming up" that she recognized who he was. (Tr. at 38–39, 41). By the time Mrs. Anjulis identified petitioner, she, too, was up front. (Tr. at 39). She stated that when she recognized the petitioner "I got right upset, because I was shocked . . . [b]ecause I never expected to see the man again". (Tr. at 39–40).[2] While Mrs. Anjulis was at the front of the hearing room, five black men were also there. At least three of these men were from Morton's Movers. (Tr. at 42). It is unclear from Mrs. Anjulis' testimony who the other two were, whether one was the petitioner[3] and whether Mrs. Anjulis knew that the black men were only witnesses at the time she identified the petitioner as the robber.

The other witness to the robbery was Mrs. Patti. She noticed that Mrs. An-

julis had three customers in her line. She stated that she wanted "to get some of the customers out of the bank" so she "asked one of the three to come over to . . . [her] window". (Tr. at 49). The last customer did, leaving the petitioner, whom she identified as the robber, standing second in Mrs. Anjulis' line. (Tr. at 52). She stated that she again observed the petitioner when Mrs. Anjulis was putting money in the bag. She testified that she also observed him when he was half way out of the bank, a distance of about five feet, and again just before he exited, a distance of twenty feet, since both times he turned around and faced her. (Tr. 49–54). She stated that the entire time of the robbery was "within a five-minute interval from the time [she] . . . spotted the customers in her [Mrs. Anjulis'] line". (Tr. at 55). Mrs. Patti described petitioner as wearing gray pants, a charcoal color sweater and that his eyes "caught my attention". (Tr. at 55). Since the witnesses were sequestered, (Tr. at 3), it is significant to note that Mrs. Patti's description agrees with Mrs. Anjulis'.

Both witnesses referred to something unusual about the robber's eyes. With respect to this the prosecutor asked Mrs. Patti (Tr. at 56):

"Q. But, is there anything specifically that you can remember, today, that you could say is what gave you cause to think something was different about his eyes?

A. Off center—being off center.

Q. Now, I ask you to look at the defendant in the courtroom, today, and I ask you if there is any difference in the way his eyes appear today as they appeared on that day?

2. Robert Long, one of the movers at the hearing, stated that one of the ladies was crying. (Tr. at 107).

3. On page 73 of the Trial Transcript Mrs. Patti, the other teller who witnessed the robbery, stated that four of the five men were movers. Robert Long, one of the movers, claimed that there were six black men up front including petitioner and that three were the movers. (Tr. at 104–105). It also appears that one of the black men was William Silver. (Tr. at 114). Mr. Shuman, petitioner's attorney at the preliminary hearing, hesitantly stated that there were four black men before the judge. (Tr. at 94).

A. No, they remain the same.

Q. I see.

> THE COURT: Let the record show that the defendant's left eye apparently has a —I don't know what they call it, whether it is a cast or whatever it may be—but, it's not in the center of the eye socket.
>
> THE WITNESS: Right."

Mrs. Patti was shown photographs and, like Mrs. Anjulis, she failed to identify any as that of the robber. However, nowhere in the transcript, as discussed more fully later, is there any definite proof that petitioner's photograph was among them. (Tr. at 68–70).

Mrs. Patti also attended the lineup on the night of February 14, 1969, and the preliminary hearing held the following morning. Although at the lineup she identified someone other than the petitioner as the robber, Mrs. Patti experienced no similar difficulty in positively identifying the petitioner at the hearing. Her testimony on direct examination at the suppression hearing concerning these events is relevant not only to explain the different results but also to show Mrs. Anjulis' participation at the hearing. She begins by explaining why she identified the wrong man at the lineup (Tr. at 57–61):

"A. Well, I was not aware of the fact —first of all, on a lineup—when we were held up, he did not have a goatee.

Q. He didn't have what?

A. Goatee, or hair around his mouth when we were held up. And at the lineup, there were three people. Two of the three had goatees, and the one that did not is the one I choose.

Q. Yes.

A. So this threw me off. Now, when we were in Southern Police Station, I was not aware of this gentleman, who he was, or whoever he was— and the minute he walked in that door, I said to Mrs. Anjulis, there's our man.

Q. Now, you say you saw him walk in the door. Is that the door to the courtroom?

A. Yes, it is. We were seated.

Q. How long had you been seated there before you had to go up and testify? How long were you in the courtroom?

A. I would say a good 15 minutes, 10 or 15 [4] minutes. And I observed him pretty clearly, and the profile of his walk and the way he carried himself, and just studying his side profile. I knew that was he.

Q. Now, when he came in the courtroom, did you know that your case was being called next?

A. No, definitely not. We were not even recognized as being there up to that point.

Q. When you say—do you mean by the Court?

A. The Court, right.

Q. Did you know that that man that you saw, did anybody tell you—was there any indication that the person that you saw on that day was, in fact, the same man that had been in your bank back in November?

A. No one told me that.

Q. Now, subsequently, were you called up to the Bench?

A. Yes, in a group. We all went at the same time.

Q. And did you identify the defendant, again, there?

A. I certainly did.

Q. And is this the same person you see in the courtroom, today?

A. Yes, it is.

Q. And with relation to his face, was there anything different about it on that day than there was on any other day—than there was on the day that you saw him in the bank?

---

4. Mrs. Anjulis stated the wait to be about forty-five minutes. (Tr. at 38.)

A. Are you referring to his eyes?

Q. Well, anything, Was there anything different about him?

A. (Shook head negatively.)

Q. You said before that one of the men in the lineup—

A. You are referring to the goatee?

Q. I'm asking you.

A. Oh, yes, yes.

Q. Well, did he have a goatee, is that what you are saying?

A. Yes, he did.

Q. I see. Now, did it cover—what did it cover, specifically, on his face? What portions?

A. It covered above, right here, and down through here (indicating).

Q. Indicating the lip?

A. The lip.

Q. Down around the chin in a circular fashion?

A. Right. And there was nothing at the time of the holdup. He had nothing at all on his face.

Q. Now, I ask you if your identification this morning is based on the fact that this man is the man that you saw in the bank on that day, or is it based on the fact that somebody suggested to you that this was the man?

A. No one suggested it at all. I am definite, positive that this is the gentleman that I seen in the bank."

On cross-examination the defense attorney diligently probed the ability of Mrs. Patti to observe the face of the robber at the bank and also petitioner's face at the lineup and the hearing. (Tr. at 61–66).

"Q. Mrs. Patti, you say that you observed the man from the inception to the time he left the bank for a period of five minutes?

A. Yes, sir.

Q. And anywheres from five feet to twenty feet?

A. (Nodded head affirmatively.)

Q. Now, how much of that five minutes, or about five minutes did you have a full view—a full-faced view of him?

A. Almost the full length of time, because I waited on my customer, and I only had to cash a check, and it was a matter of minutes.

Q. I'm talking about face-to-face, directly face-to-face?

A. That's what I'm saying, because he was—after he had taken the bag from Mrs. Anjulis, he walked and he turned around, and that is when I had the face-to-face—see, I had already been through my customers.

Q. I said how much of this time did you have a full-face view?

A. Well, when I was walking behind her, I had a face view, and then I stopped—I would say, out of the five minutes, three and a half, all the time together, three and a half to five minutes—three and a half out of the five minutes.

Q. Now, at the lineup on February the 14th, how long a period of time did you view that lineup?

A. Not very long.[5]

Q. Not very long?

A. Well, the thing is, that was the first time I had ever been there. We worked twelve hours, and this was a new experience for me. I looked at the gentleman, there—

Q. Same story—go ahead.

A. —and I observed—tried to pick out the points. I knew it was something about the eyes. The officer did tell me if I had any question, that he can move or say anything. I failed to do that.

Q. What officer told you what?

A. They said if I have any—if I would like for him to say something or

5. Later in the transcript at 77 Mrs. Patti stated, and the lineup sheet agrees, that she viewed the lineup for about one minute.

to turn around—which I failed to do.

Q. Well, actually, the man was turned around different views, was he not?

A. No, face on.

Q. Full-face?

A. Right.

Q. Now, did you look into his eyes? You have made quite an issue of the fact of those eyes.

A. Right.

Q. Right?

A. Right.

Q. Did you look real good into those eyes?

A. No. Evidently I did not.

Q. What do you mean by evidently?

A. I did not look into his eyes.

Q. Why didn't you look into his eyes, if that is the only form of identification you have in here, today?

MR. HARLAN: I object to that, your Honor. That is certainly—

THE COURT: Strike it out.

By MR. GERTZ:

Q. Isn't that the only thing that you have identified this man on, is his eyes?

A. Right, because I knew there was something with his eyes.

Q. All right. Now, you were brought to a lineup, and the only thing that you have inbeded in your mind are those eyes, is that so?

A. That's right.

Q. And you want this Court to believe that you, at a lineup, did not look into those eyes—were not looking for those eyes?

MR. HARLAN: Pardon me—I object to the form of the question, what she wants the Court to believe.

THE COURT: I will sustain the objection.

MR. GERTZ: All right.

THE WITNESS: I was studying the three men and the hair around the mouth.

BY MR. GERTZ:

Q. What three men? Were there only three men in the lineup?

A. Three men in the lineup. I was studying the hair around—I wasn't looking for someone behind the hair of the mouth. I was trying to study the faces and visualize the man I seen, and I just failed to take notice of the eyes. The hair—I mean, I was just observing the man.

Q. You mean you couldn't identify the man, isn't that what you are saying?

A. At that time.

THE COURT: She said that, Mr. Gertz.

BY MR. GERTZ:

Q. Did you look into each one of their eyes?

A. Not that good. Evidently not that good.

Q. But, in the courtroom the next morning, was the courtroom crowded?

A. It certainly was.

Q. The courtroom was crowded. And how far away from you was the man brought in from the door?

A. I was sitting on the end of the bench, and the man came in the door, I would say the end of this table (indicating), and I looked straight at him.

Q. All right.

THE COURT: That is approximately two feet.

THE WITNESS: Right.

BY MR. GERTZ:

Q. And let me ask you this—you then told Mrs. Anjulis what?

A. I said, Mrs. Anjulis, that's our man.

Q. You told her that?

A. Right.

Q. You are positive about that?

A. Positive.

Q. Now, did you discuss this case, or did anybody discuss this case with you between the time of the lineup on February the 14th and a preliminary hearing the next morning?

A. No, sir."

Although there is substantial redundancy in the testimony elicited at trial on cross examination pertaining to Mrs. Patti's identification of the wrong person at the lineup, it will be set out hereafter since it does shed a little light on the subject and it is also heavily relied upon by petitioner as discussed *infra*. (Tr. at 166–169):

"BY MR. GERTZ: [On Cross-Examination]

Q. Mrs. Patti, you, at that lineup on Friday night, February the 14th, were told to take your time, as long as you wanted, to view those men, were you not?

A. That's right.

Q. And did you not take at least three to five minutes as you testified this morning to view that lineup?

A. I didn't say I took three to five minutes. I didn't state any time this morning.

Q. You didn't?

A. No, I didn't.

Q. How long did you take? Was it that you were so certain that he was not there that you didn't need any more time than you took?

A. No, I didn't say that. I said that when I got in there, there were two men with a goatee, and two without. I was trying to visualize this man, and a goatee was my—I just noticed the hair, and I tried to visualize him without that. That's where I had given my most interest to, because I knew that he did not have it.

Q. Well, your primary source of identification, as you testified, here, of saying this is the man, you were talking about the eyes, is that correct?

A. That's right.

Q. And here you are bringing in a goatee, that you were more concerned about a goatee than the eyes. Now, did you observe the eyes of these four people? You were brought in there to identify—

MR. HARLAN: Your Honor, let her answer.

THE COURT: Let her answer the question.

MR. HARLAN: One question at a time.

THE WITNESS: What was the question, again?

BY MR. GERTZ:

Q. You were brought in to identify—you were brought in to identify somebody who allegedly held up this bank. You have testified that your reason for saying it was Mr. Jones is that you will never forget those eyes.

A. (Nodded head affirmatively.)

Q. Now, at this lineup of these four men that Friday night, February the 14th, did you look at the eyes of all these four men?

A. I would say no, I didn't.

Q. You didn't?

A. I tried to visualize this man. This is the first time I have gone through anything like this. It was a long day. The room was dark. I tried to visualize this man, and I knew two of the four had a goatee, two didn't, and I'm trying to—if I knew he was among them, I'm trying to visualize this man without the hair, and I didn't give that much attention to the eyes.

Q. Mrs. Patti, your primary source of identification was the eyes, was it not?

A. That's right.

Q. Now, did you look for the eyes that were so implanted in your mind,

did you look for those eyes in these four people that were before you?

A. Not that closely, no, I didn't.

Q. You didn't?

A. (Shook head negatively.)

Q. Do you now recall that Mr. Jones was one of the four people in the lineup?

MR. HARLAN: Your Honor, I object to that. How would she know if she couldn't identify him?

THE COURT: Sustained.

BY MR. GERTZ:

Q. Now, the next morning you went to the preliminary hearing?

A. That is correct.

Q. Is that the first time that you had been to a preliminary hearing in a court? Were you excited and nervous?

A. No, I wasn't. I had nothing to be nervous about. It was a new experience to me, but I had just sat there to give the information that was going to be asked of me."

Mrs. Patti's testimony at the suppression hearing further indicated that, after the petitioner was brought before the judge in custody, the four truckmen, who were already in the courtroom, were called to the front of the courtroom, apparently as witnesses, not in custody, and without any mention being made as to whether that case involved the robbery. At this time Mrs. Patti, being ignorant of the reason why the five black men were before the judge, on her own and without *any* prompting again recognized the petitioner as the robber. (Tr. at 72–75, 171).

There appears on the surface to be a conflict between Mrs. Anjulis' and Mrs. Patti's testimony as to what transpired at the preliminary hearing. Mrs. Anjulis' stated that she did not discuss the case with anyone prior to the hearing and that she first recognized and identified the petitioner to the court when she and Mrs. Patti were called before the Judge. Mrs. Patti testified that she first recognized the petitioner when he was brought in and stated so to Mrs. Anjulis. However, Mrs. Anjulis stated that she did not see or notice him until she, Mrs. Patti and the petitioner were before the Judge. It can reasonably be concluded that Mrs. Anjulis did not hear (or if she heard she did not understand) the comment of Mrs. Patti since she testified later at trial after being asked specifically whether somebody "said to you that there's the man" that "nobody pointed him out to me", (Tr. at 152–153), and that she did not notice or see him until all were before the Judge.

Although other people testified at the suppression hearing, as summarized below, Mrs. Anjulis and Mrs. Patti formed *the basis of petitioner's claim that their in-court identification was tainted.* Moreover, at the hearing Charles L. Shuman testified that he was retained to and did represent petitioner at the lineup and the preliminary hearing. Other than that, his testimony added nothing to the facts as hereinabove set forth. The other witnesses at the hearing were three brothers who the prosecutor alleged were the movers whom the petitioner spoke to three hours after the robbery. Their testimony at the suppression hearing was limited to the facts surrounding the preliminary hearing held on February 15, 1969. The first of the brothers to testify, Robert Long, stated that he was called by name, that other people were asked to come to the front of the courtroom, that he could not remember if he was at the Bench before petitioner, that there were six black men at the Bench including petitioner, that the two tellers identified petitioner, that one lady was crying and that he did not know when the ladies came to the Bench. (Tr. at 97). The second mover and brother to testify was Francis Cowan. He stated, among other things, that he could not remember whether petitioner was brought to the Bench before or after them and that he could not remember whether petitioner was even the person at the preliminary hearing, much less if he was brought to the Judge before or after the tellers. (Tr. at 108). The

third and final mover and brother to testify was Leroy Goines. He stated that a young boy was before the Judge with the rest of the witnesses and that the petitioner was brought in after *all* the witnesses were before the Bench. With respect to the latter, as it contradicts the tellers, who said that they were called after petitioner was brought in, the following appears in the transcript (Tr. at 111–116):

"Q. Now, [Mr. Goines] was this man, Mr. Jones, at the Bench, then, or was he brought in—

A. He was brought in after we got up there.

Q. He was brought in after you were all up there?

A. Uh-huh.

Q. Including the two ladies?

A. Uh-huh.

Q. All right.

MR. HARLAN: Your Honor, I object. It is all leading. He was led right into that answer, and I move it all be stricken.

THE COURT: I won't strike it, but for whatever weight it may have, I will consider it.

MR. HARLAN: Thank you, your Honor."

This concluded the testimony at the suppression hearing, which was held just before the trial commenced. At the end of the hearing, the Court heard vigorous argument that the in-court identification would be tainted by the pretrial confrontations. Specifically it was alleged that the absence of identification at the lineup by one teller, with the wrong identification by the other teller at the lineup, produced a tainted pretrial confrontation when the tellers were the morning after the lineup asked to identify the petitioner who, as the photographs submitted to this Court show, was in the lineup, after he was brought into Court in custody. The thrust of the argument is that the state was singling out the petitioner as the robber to the eyewitnesses. The defense also pointed up inconsistencies in the testimony between the tellers and Leroy Goines as hereinabove set out. (Tr. at 118–22).

In response to the oral argument, the Court specifically held the pretrial confrontations to have been conducted fairly:

"[I]t would appear to me that the in-court identification which is to be offered, here, as well as the identification which was made at the Municipal Court is made on the basis of information which was available to these witnesses as a result of their confrontation with this defendant at the time that the case was heard. Now, for you to suggest, for example, that a witness should not be entitled to make an in-court identification merely because there was a preliminary hearing at which the defendant was arraigned, and a preliminary hearing held, is to suggest that you could never have in-court identification after there had been a preliminary hearing. Now, that is not the law. The law says that if an in-court identification is based on tainted evidence—and what is the tainted evidence that they talk about? A lineup in which he was not represented by counsel, or evidence to indicate that there was some suggestion made to the person who is making the identification that this is the man or evidence of some unfair confrontation. The only confrontation that you have in this entire case from which an identification is made was the confrontation that was made at the time of the preliminary hearing and there is not a single scintilla of evidence to indicate that that was unfairly conducted. In addition to which, this man was represented by counsel at the time of the arraignment at the Municipal Court, and if there was any suggestion that there was anything unfair about the identification that was made at the Municipal Court, he had counsel, and counsel certainly had every right to raise that point at the time of the proposed identification. He did not do it.

"Under all the circumstances, I think that the fact that this man was identified at the preliminary hearing and the in-court identification, which is sought to be made by the two witnesses who identify him, today, are matters which should be presented to the jury for its consideration. Now, as to the weight to be given to it, as to whether or not—the fact that they did not identify him in the lineup— these are arguments which can and should be made to the jury, itself. It is not up to me to decide that. The jury decides that.

\* \* \* \* \* \*

"But, there is no question that there is no evidence on which I can suppress the proposed in-court identification of these two witnesses. I don't find it to have been tainted by any unfair confrontation beforehand. And on that basis, I will permit them to make their identification under appropriate protections, of course.

"All right. I will overrule your motion."

At the trial before a jury the tellers gave substantially the same testimony as set out above. (Tr. at 132–174). William Silvers, age 15, also testified. He stated that he was sitting on the steps of his house with Romeo Roach about three hours after the robbery when he heard the petitioner, also known to him for a year as "Pea-Eye", ask the moving men "to take him uptown" for five dollars. (Tr. at 178). He stated that when the petitioner went behind the truck to pull out the money it all fell to the ground at which time "[e]verybody was fighting over it." By everybody he meant the petitioner and the three movers. (Tr. at 179). He claimed that the movers, himself and Romeo Roach all recovered some of the money. Finally, he

testified that he later turned over his share to Officer Schwinn, that he told the officer what happened and that the moving men had some of the money. (Tr. at 189–190).

Officer Schwinn [6] testified at the trial that, after he spoke with William Silver on the day of the robbery, he caused a warrant to be issued for petitioner's arrest on November 6, 1968, the day after the robbery. (Tr. at 193–196, 199–200).

The movers also testified at the trial. Leroy Goines adequately summarized their confrontation in the street with the person who William Silver claims is the petitioner (Tr. at 207–209):

"Q. Your name is Goines, is that correct?

A. Right.

Q. These two gentlemen are actually your brothers, aren't they?

A. Uh-huh.

Q. Now, can you tell the jury exactly, to the best of your memory, what happened on that day in that afternoon?

THE COURT: First tell us approximately what time it was.

THE WITNESS: Well, I can't say what time it was.

THE COURT: Well, about?

THE WITNESS: Around about 4:00, 4:30.

THE COURT: All right.

BY MR. HARLAN:

Q. What, if anything, unusual took place at that time?

A. We were just finished loading the truck, and we were closing the door, so a fellow came down the street, and she say—she asked Robert, say, I'll give you five dollars to take me up town. So Robert say

---

6. Q. How did you happen to come to Mr. Silvers' home?
 A. Through information received in the neighborhood due to the bank robbery.
 Q. Due to what?
 A. Due to a bank robbery. We received certain information that fellows in

the neighborhood were looking for two boys who were supposed to have gotten the big bulk of a bank holdup that was fouled up when a person dropped some money.

okay. So, the fellow went behind the truck—I guess he was getting the money out—and he dropped it. So, we went in the back of the truck and seen the money on the ground, so we started picking it up.

Q. Did you pick up some of that money?

A. I picked up some.

Q. Continue—I'm sorry.

A. So, he put his hand in his pocket like he had a gun, and he told us to move back. So, then he say—he say, that's all right, get down and pick it all up. So we got down to pick it up and we put it in our pockets, and we got in the truck. So, we started the truck up, and he jumps on the side of it and asked for his money back. So, Robert gave him some money, so he wouldn't get off. So, I got out the truck, pulled him off, and threw him on the ground. So, we got in the truck and came on up town.

Q. Now, the next day, did you have an occasion to see Sgt. Conroy?

A. Yes, I did.

Q. Were you with your other two brothers when you saw Sgt. Conroy?

A. Yes, I was.

Q. What did you do with that money that you had found on the ground that day, that came from—

A. What did I do with it?

Q. Yes.

A. I gave most of it back.

Q. Who did you give it to?

A. I gave it to the Sergeant.

Q. You gave it to Sgt. Conroy?

A. Uh-huh.

Q. What did your brothers, Mr. Long and Mr. Cowan do with their money?

A. They gave some of it back, too.

MR. HARLAN: All right. Witness with you."

Notwithstanding the above incident, Leroy Goines was unable to state whether or not petitioner was the person who asked the movers for a ride since he "didn't pay no attention to him". (Tr. at 210). Francis Cowan, the second mover to testify at the trial stated that he thought the petitioner was the person who approached him on the day of the robbery but that he was not sure. (Tr. at 234). The last of the movers was Robert Long and he claimed that he could not identify the petitioner to be the man who approached them and asked them for a ride since he did not pay that much attention to the man on the day of the incident. (Tr. at 241–243).

Officer Conroy related at trial that he recovered from Leroy Goines, Robert Long and Francis Cowan some of the marked money stolen from the bank petitioner is alleged to have robbed. (Tr. at 212–219). He further stated that, when he arrested petitioner on a warrant on February 14, 1969, a little over four months after the robbery, petitioner did not have any of the marked money on him. (Tr. at 223). Finally, the officer stated that he had spoken with petitioner's mother and the owner of the house petitioner lived in prior to the arrest and that he had asked them to have petitioner contact the police, since they had a warrant for his arrest, but that petitioner never did. (Tr. at 224–227).

Watson Reed, petitioner's neighbor living on the same floor of the house, testified that on the day of the robbery he saw petitioner at 12:30 enter "the bathroom to wash up". (Tr. at 248). Notably, the robbery occurred at approximately 12:55. He stated that the petitioner told him that he was going to his mother's house and that he, Watson Reed, left right after that at 12:35 thereby rendering himself unable to state when petitioner left the house. On cross examination it was shown that the witness is a friend of petitioner and that he was not able to state on any other day what petitioner was doing except that he recalls petitioner being at the house some time during the two days following the robbery. The witness specifically remembered the day of the robbery since it was election day and he was

waiting for the bars to open at 6:00 p. m. (Tr. at 252, 254).

Reed further stated that he has been convicted of mugging and that he did not tell the petitioner that the police were looking for him since "it was none of my affair". (Tr. at 253, 255).

At the conclusion of the testimony the petitioner was convicted by a jury.

## THE IDENTIFICATION ANALYZED

### A. *The Display of Photographs*

The first ground concerns the photographs shown to the tellers after the robbery of which they were not able to identify any as being those of the robber. The petitioner asserts that it is "likely" that the photographs shown to the tellers included petitioner's since (1) petitioner had "a long criminal record" and, therefore, it is reasonable to assume that his photograph was readily available, (2) the police had spoken to William Silvers, who saw petitioner drop some money after the robbery, two hours before they spoke to Mrs. Anjulis and probably before they spoke to Mrs. Patti, and, therefore, it was likely that they used his picture since they had his name, and (3) there was a comment in court by petitioner's attorney that he would demonstrate later that petitioner's photograph was among those shown.

▌ Although the police may have had the picture in their files, that fact alone is not enough to justify the assumption that they knew enough to place it among those shown to the tellers. The petitioner alleges that Officer Schwinn stated that he spoke with William Silver before the tellers were shown pictures. On page 194 of the trial transcript Officer Schwinn states the time he interviewed Silver which, if correct, would place him with Silver before he spoke with Mrs. Anjulis; however, on cross-examination he admitted that he was wrong as to the time. The correct time would place him at Silver's house *after* Mrs. Anjulis was shown photographs. (Tr. at 200–201). Clearly, there is nothing about Officer Schwinn's

confrontation with Silver that would lead one to believe that the police included petitioner's photograph with those that were shown to Mrs. Anjulis.

On the other hand, as to Mrs. Patti, nowhere in the record is there any evidence as to which officer showed her photographs, when he conducted the showing, whose photographs were used in the showing, or even whether the officer was aware of petitioner's name prior to the showing. Furthermore, Mrs. Patti could not remember when she was shown the photographs. She thought that it was not on the night of the robbery but she was not sure. (Tr. at 68–70).

Finally, petitioner claims that his photograph was among those shown since his attorney at the suppression hearing stated that he *thought* "it would be developed through the police, through the pictures that have been submitted". (Tr. at 28). This statement was made only with respect to those photographs shown to Mrs. Anjulis, and, not only did the prosecutor flatly state that Mrs. Anjulis was not shown any pictures of the petitioner (Tr. at 28) but also there does not appear any other indication in the record that Mrs. Anjulis was shown petitioner's photograph.

▌ However, assuming petitioner's photograph was among those shown to the tellers, "the fact that a witness cannot identify an accused from a photograph is no reason for exluding his testimony identifying the accused in court." United States v. Toney, 440 F.2d 590, 591 (6 Cir. 1971). This is further buttressed by the fact that the time between the viewing of the photographs and the lineup was almost three and a half months, therefore, "[n]o situation is present here where an identification by photographs is made shortly before trial but long after the commission of the crime which might tend to increase the chance that the photographs would be more vivid in the witnesses' mind than their recollection of the robbery during the commission of the crime". United States v. Marson, 408 F.2d 644, 651 (4

Cir. 1968), cert. den., 393 U.S. 1056, 89 S.Ct. 695, 21 L.Ed.2d 698, reh. den., 393 U.S. 1124, 89 S.Ct. 996, 22 L.Ed.2d 132 (1969). This Court concludes that the displaying of the photographs was not done under circumstances and conditions tending to taint the identifications at trial.

### B. *Alleged Defects in Eyewitness Testimony*

■■ For his second claim petitioner refers to his lineup. He does not allege that the lineup was conducted improperly. As a matter of fact, petitioner was represented by the same attorney at the lineup that he had at the preliminary hearing whose name was Mr. Shuman.[7] However, he does assert that:

> "It is clear from the record that Mrs. Anjulis and Mrs. Patti collaborated prior to the trial concerning how they would explain away their failure to make an identification. Mrs. Anjulis testified that she had worked late that day, that she had never before been to a lineup, that she was nervous, confused and upset (T. 23, 148–149). Mrs. Patti testified that it was the first lineup she had ever attended and that she had worked all day (T. 62, 168). Although both women testified that the most important identifying feature of the robber was his somewhat different eyes (T. 16–17 and T. 55–56), neither could explain why they failed to look for that feature at the lineup (T. 148–149 and T. 64–65)."

Petitioner's Brief as submitted by Legal Aid at 8. This Court declines to accept petitioner's interpretation of the tellers' testimony as a "collaboration". There is absolutely no evidence in the record to indicate that the tellers' testimony was anything but the truth. Moreover, this Court disagrees with petitioner's assertion that the tellers could not explain their failure to identify petitioner at the lineup premised on the distinguishing feature. Mrs. Anjulis candidly explained her inability to locate petitioner in the lineup by stating, in summary, that it was her first lineup, that she was very nervous, that she was confused, that she had worked "hard" all day up to 8:00 p. m. which was forty-five minutes before the lineup [8] and that she did not know what to expect. Mrs. Patti had no difficulty in accounting for her identification of the wrong person at the lineup by stating, among other things, that she had just worked 12 hours, and that the petitioner's "goatee" distracted her and, therefore, since at the time of the robbery petitioner was clean shaven, she only concentrated on the one that had no "goatee." There does not appear anywhere in the record any reason why these explanations should not be believed. Finally, the fact that a witness has difficulty in identifying a person during a pretrial confrontation would not be grounds, by itself, to exclude the identification testimony at trial. United States v. Toney, 440 F.2d 590 (6 Cir. 1971). See United States v. Davis, 407 F.2d 846 (4 Cir. 1969); Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1240 (1968), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); United States v. Richards, 442 F.2d 922 (4 Cir. 1971); United States v. Jackson, 448 F.2d 963 (9 Cir. 1971), cert. den., Willis v. United States, 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972); United States v. Hinkle, 145 U.S.App.D.C. 234, 448 F.2d 1157 (1971); United States v. Cole, 449 F.2d 194 (8 Cir. 1971), cert. den., Woodard v. United States, 405 U.S. 931, 92 S.Ct. 987, 30 L.Ed.2d 806 (1972). See also United States v. Famulari, 447 F.2d 1377 (2 Cir. 1971).

### C. *Preliminary Hearing as a Substitute Lineup*

In his third ground for support, the petitioner alleges that:

> "The trial court apparently based its decision not to exclude any identifi-

---

7. A different attorney represented petitioner at the suppression hearing and trial.

8. The lineup was conducted a little before 9:00 p. m. (Tr. at 77).

cation evidence, at least in part, on the fact that in addition to Petitioner, there were several other 'colored males' before the judge at the preliminary hearing when the identifications were made. See his close questioning of the witnesses on this point at T. 41–43 (Mrs. Anjulis); T. 72–73 (Mrs. Patti); T. 94–95 (Charles Shuman); T. 104–105 (Robert Long). The trial judge was perhaps trying to analogize what happened at the preliminary hearing to a lineup. The witnesses picked out Petitioner from among several black men. What he overlooked however was the uncontradicted evidence that Petitioner was the only man who had been led into the courtroom in handcuffs, by a policeman, and who was in custody at the bench. (T. 73–75). The suggestiveness of such a confrontation is undeniable." Petitioner's Brief is submitted by Legal Aid at page 12.

This Court has no occasion to pass on the validity of this argument since this petition will be decided on other grounds. However, it is noted, as hereinabove pointed out, that Mrs. Patti testified that she recognized petitioner as the robber prior to the case being called at the preliminary hearing. Therefore, at least as to her, this reasoning has no foundation.

### D. Identification Based on a Single Physical Characteristic

The fourth contention raised by petitioner is that the identification was improperly based on a single physical characteristic of the petitioner. Specifically, the petitioner states:

"This identification, based on a single physical characteristic, made after a face-to-face confrontation between the witness and the accused, is precisely the kind of prejudicial and impermissably suggestive identification that the Honorable Judge Sobeloff was referring to in writing for the Fourth Circuit, sitting *en banc*, in Palmer v. Peyton [, 359 F.2d 199]:

'Any identification process, of course, involves danger that the percipient may be influenced by prior formed attitudes . . . Where the witness bases the identification on only part of the suspect's total personality, such as height alone, *or eyes alone*, or voice alone, prior suggestions will have most fertile soil in which to grow to conviction. This is especially so *when the identifier is presented with no alternative choices*; there is then a strong predisposition to overcome doubts and to fasten guilt upon the lone suspect.' Palmer v. Peyton, 359 F.2d 199 at 201 (4th Cir. 1966) [emphasis added.]." Petitioner's Brief as submitted by Legal Aid at page 13.

This Court cannot agree that the identification of petitioner was "precisely the kind of prejudicial and impermissably suggestive identification" that occurred in Palmer v. Peyton, 359 F.2d 199 (4 Cir. 1966). In *Palmer* the identifying witness was raped by a black male with a bag over his head, wearing an orange-colored sport shirt. The witness was unable to recall anything else except that he had been drinking, that he was about the same height as she was and that "he spoke with a 'high childlike voice . . . like a quiz kid or an M. C. asking questions'." Palmer v. Peyton, 359 F.2d 199, 200 (4 Cir. 1966).

On the night of the rape the witness viewed a lineup of four or five blacks to test her ability to recognize voices. Palmer was not in that group. The suspects walked back and forth before the witness and each spoke but no identification was made. On the following day Robert Flythe, also a suspect, informed the police that Palmer told him that he (Palmer) raped the witness. Palmer was arrested wearing an orange-colored shirt; but it was never identified as the one worn during the rape. Palmer's wife and a neighbor testified that Palmer was not wearing it the day of the rape. Moreover, Flythe not only had a similar shirt but also he was the only person

who claims he saw Palmer wearing the shirt the day of the rape.

After the witness was told that the police had a black suspect, she was brought to the police station to listen to his voice. Since what happened to Palmer at the station distinguishes his case from the petitioner's, it merits repeating here (Palmer v. Peyton, *supra* at 200–201):

"The events which followed in the station house resulted in the principal evidence relied on by the State to connect Palmer to the offense. In stark contrast to the previous evening there was no lineup. Mrs. Britt was not allowed to see the suspect whom she was attempting to identify. For some unexplained reason Flythe was not subjected to a voice identification, despite the fact that he had been a suspect several hours before and his self-exculpatory statements were the only basis for Palmer's arrest. Nor did the police provide any other voices for comparison with Palmer's.

"Mrs. Britt and her neighbor were placed in one room, while Palmer, Sheriff Early, and another officer were in an adjoining room separated by a door which was left 'a little ajar.' The orange-colored shirt, which Palmer was wearing when arrested the day after the attack, had been removed from his back before Mrs. Britt arrived at the station, and was shown to her while she was seated in the adjoining room. This was the shirt Mrs. Britt described at the trials as 'about the same color' as that worn by her attacker. Sheriff Early's testimony was unclear as to whether the shirt was shown to her before listening to the voice, or immediately thereafter.

"Mrs. Britt had previously told the police of certain phrases that her assailant uttered, and these were used as the vehicle for identification. The Sheriff directed Palmer to repeat after him the words which Mrs. Britt had

attributed to the intruder, and Palmer obeyed. The clothespin bag which had been described as 'fitting snugly' over the attacker's head was in the Sheriff's possession but was not used during the interrogation. After listening to this exchange for several minutes, Mrs. Britt, in answer to a question by Sheriff Early, stated that one of the voices she had heard in the adjoining room was that of her assailant. Palmer was given no opportunity to confront or to be confronted by his accuser, where she might have made a comparison of his color with that of her assailant or might have noticed some mark or mannerism that could aid her in affirming—or disavowing—the voice identification."

Other than Flythe's statement, the above testimony of the witness was the sole evidence linking Palmer to the crime.[9] Palmer v. Peyton, *supra* 201. In finding for Palmer the Fourth Circuit stated—as marked contrast to the instant case—that (Palmer v. Peyton, *supra* at 201):

"The opportunity for suggestion inherent in the procedure used to secure this identification is manifest. Before listening to the voice that spoke in response to the Sheriff in the station, Mrs. Britt had been told that the police had a Negro suspect in custody. She had been shown the suspect's shirt—the shirt which she later testified was 'about the same color' as that worn by her assailant. On Wednesday evening, in accordance with customary practice, Mrs. Britt had been asked to select one of a number of persons in a lineup. It is noteworthy that on Thursday evening an entirely different course was followed. Palmer's was the only voice the complainant was permitted to hear repeat the damning words. When she was asked if she could identify the voice, the only voice that was submitted for identification, the highly suggestive atmos-

9. Additionally, the witness did not attempt to identify Palmer in open court. Palmer v. Peyton, *supra* at 201.

phere that had been generated could not have failed to affect her judgment."

In the next paragraph, Judge Sobeloff, understandably, stated what petitioner relies upon as support for his contention that he was identified in an improper manner.[10]

■ The *Palmer* case on its facts is readily distinguishable from the petitioner's case since each time petitioner was identified the tellers viewed him in his entirety, with petitioner's attorney present and with the advantage of having any part of his features or personality reasonably available to them that they wished to consider; whereas in *Palmer,* the witness had only one narrow aspect of Palmer available to her, under questionable conditions, to base an identification on—his voice. To state that *Palmer* holds, as the petitioner would like to have done, that an identification cannot be made based on a distinguishing characteristic of a suspect as part of his total makeup and personality extends *Palmer* unrealistically too far and, therefore, this Court declines to do so. See United States v. Sherman, 421 F.2d 198, 200 (4 Cir. 1970), cert. den., 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970); United States v. Quarles, 387 F.2d 551, 556 (4 Cir. 1967), cert. den., 391 U.S. 922, 88 S.Ct. 1815, 20 L.Ed.2d 659 (1968).

E. *When Mrs. Patti Identified Petititioner the State Was Saying "That's the Man"*

The fifth position the petitioner takes is that he was prejudiced when he was singled out at the preliminary hearing. Specifically he claims that:

"The government was unable to secure a positive identification of Petitioner from the two tellers at the lineup on Friday night February 14. The very next morning, the State set up a face to face one-on-one confrontation between Petitioner and the two witnesses at a preliminary hearing. There is no evidence on the record to indicate bad faith or maliciousness on the part of the State, but the fact remains that the unfair confrontation took place and identifications were made, as the State had intended that they be made.

"The preliminary hearing was held approximately twelve hours after the lineup. Petitioner was the only person at the preliminary hearing who had been in the lineup. The State was in effect saying to the witnesses, 'That's the man.' See Foster v. California, 394 U.S. 440 [, 89 S.Ct. 1127, 22 L.Ed. 2d 402] (1969). See also United States v. Davis, *supra,* 407 F.2d 846 (4 Cir. 1969) and United States v. Marson, *supra,* 408 F.2d 644 (4 Cir. 1968)."

■ Mrs. Patti's testimony relating to the circumstances surrounding the confrontation at the hearing reveals, contrary to petitioner's claim of prejudice based on a "that's the man" theory, is that the initial identification of the petitioner was made spontaneously, before the hearing had started while she was a bystander in the courtroom, unsuggested by the state and at a time when the witness was not informed that the petitioner was a suspect or in any way involved in her case. Her testimony further reveals that, after being summoned to the bench, Mrs. Patti again identified the petitioner. Here, especially as to the spontaneous identification, Mrs. Patti's opportunities to see the petitioner were simply those that are likely

---

10. "Any identification process, of course, involves danger that the percipient may be influenced by prior formed attitudes; indeed we are all too familiar with instances in which supposedly "irrefutable" identifications were later shown to have been incorrect . . . Where the witness bases the identification on only part of the suspect's total personality, such as height alone, or eyes alone, or voice alone, prior suggestions will have most fertile soil in which to grow to conviction. This is especially so when the identifier is presented with no alternative choices; there is then a strong predisposition to overcome doubts and to fasten guilt upon the lone suspect." Palmer, *supra,* at 201.

to occur at various stages of all criminal proceedings. United States v. Davis, 407 F.2d 846 (4 Cir. 1969). Therefore, since "[d]ue process does not require that every pretrial identification of a witness must be conducted under laboratory conditions of an approved lineup", United States v. Davis, 407 F.2d 846 (4 Cir. 1969) (citing United States v. Quarles, 389 F.2d 551, 556 (4 Cir. 1967), cert. den., 391 U.S. 922, 88 S.Ct. 1815, 20 L.Ed.2d 659 (1968)); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), spontaneous recognitions, as in this case, are not considered prejudicial. United States v. Davis, 407 F.2d 846 (4 Cir. 1969) (defendant was inadvertently seen by victim in hallway prior to in-court identification); United States v. Marson, 408 F.2d 644, 648, 650–651 (4 Cir. 1968), cert. den., 393 U.S. 1056, 89 S.Ct. 695, 21 L.Ed.2d 698, reh. den., 393 U.S. 1124, 89 S.Ct. 996, 22 L.Ed.2d 132 (1969) (after witness saw defendant enter courtroom in the company of marshals, they commented to each other that he was the robber); United States v. Hardy, 448 F.2d 423, 424 (3 Cir. 1971) (witnesses, while seated in courtroom, looked up and saw defendant seated in jury box and immediately recognized him); United States v. Jackson, 448 F.2d 963 (9 Cir. 1971), cert. den., Willis v. United States, 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972) (the witnesses observed the defendant and assumed he was the accused when he was brought into the courtroom under guard and was seated behind defendant's counsel table before he was identified); Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1240, 1249 (1968), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969) (the witnesses, after failing to recognize the defendant in photographs, "recognized the defendant instantly" at the start of the preliminary hearing); United States v. Famulari, 447 F.2d 1377, 1379 (2 Cir. 1971) (witness made tentative photographic identification but did not become positive until he saw the defendant "through the window of the courtroom door . . . at the defense table"); Allen v. Moore, 453 F.2d 970, 974 (1 Cir. 1972), cert. den., 406 U.S. 969, 92 S.Ct. 2422, 32 L.Ed.2d 668 (1972) ("Spontaneous identifications under such conditions might be said to emphasize the witness' reliability"); Cefalo v. Fitzpatrick, 434 F.2d 187, 188 n. 2 (1 Cir. 1970). See also Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed. 2d 387 (1969) (spontaneous identification just prior to lineup); Long v. United States, 137 U.S.App.D.C. 311, 424 F.2d 799 (1969) (spontaneous identification in elevator of police station). Maryland also approves of spontaneous identifications similar to the one in this case. Layman v. Maryland (State), 14 Md. App. 215, 286 A.2d 559 (1972).

Petitioner cites Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), for his theory that, as a result of the two confrontations, the state was saying "that's the man" to Mrs. Patti. This Court declines to agree that the circumstances in *Foster* are so similar to the instant case as to lead to the same conclusions. In *Foster* there was a lineup, where the defendant was more conspicuous than the others, followed by a deliberately arranged one-on-one confrontation in an office. Nevertheless, the witness was not able to identify the defendant until another lineup was conducted in which the defendant was the only person from the previous lineup. The suggestions inherent in the *Foster* case are obvious. However, the circumstances prior to Mrs. Patti's spontaneous identification are wholly dissimilar to *Foster* and, also, to hold otherwise under the facts of this case would necessitate the conclusion that, once a witness failed to identify a person at a properly conducted lineup, that witness would be forever barred from thereafter making an identification. Not only does *Foster* not require this result but also a prior failure to identify, followed by a spontaneous or in-court identification, has not been held to prejudice that final identification. See United States v. Famulari, 447 F.2d 1377 (2 Cir. 1971) (prior tenta-

tive identification followed by a spontaneous pretrial identification); United States v. Toney, 440 F.2d 590 (6 Cir. 1971) (failure to identify the accused from photographs and/or lineup goes to weight of the evidence, not the admissibility); United States v. Hardy, 448 F. 2d 423 (3 Cir. 1971) (witness made subjective identification at lineup but did not relate it to anyone because she feared her safety and she made a spontaneous identification just prior to trial after the F.B.I. informed her that protection would be afforded her if she needed it); Clemons v. United States, 133 U.S.App. D.C. 27, 408 F.2d 1230, 1240 (1968), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969) (a witness who was unable to identify the defendant "other than to say that he was 'one of two'" was able to identify him at the preliminary hearing); United States v. Davis, 407 F.2d 846 (4 Cir. 1969) (identified defendant at preliminary hearing after failing to identify him from photographs); United States v. Jackson, 448 F.2d 963 (9 Cir. 1971), cert. den., Willis v. United States, 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972). See also United States v. Cunningham, 423 F.2d 1269 (4 Cir. 1970); United States v. Richards, 442 F.2d 922 (4 Cir. 1971); United States v. Scully, 415 F.2d 680 (2 Cir. 1969); United States v. Hinkle, 145 U.S.App.D.C. 234, 448 F.2d 1157 (1971); Johnson v. Salisbury, 448 F.2d 374 (6 Cir. 1971), cert. den., 405 U.S. 928, 92 S.Ct. 979, 30 L.Ed.2d 801 (1972); Layman v. Maryland (State), 14 Md.App. 215, 286 A.2d 559 (1972). This negates any argument that Mrs. Patti should not have been allowed to testify during trial about her identification at the preliminary hearing.

### F. Identification of Defendant While in Custody

 Moreover, as to petitioner's sixth contention, the fact that petitioner was in custody when Mrs. Patti identified him does not require a contrary conclusion as to the propriety of the spontaneous identification made by her. United States v. Jackson, *supra*; United States v. Famulari, *supra*. See also United States v. Cunningham, *supra*; United States v. Marson, *supra*; United States v. Hardy, *supra*.

### G. The "Goatee" Issue

The efficacy of the identification is not altered by what on the surface appears to be some confusion in Mrs. Patti's testimony concerning the existence of a "goatee" on the petitioner at the time of the lineup—petitioner's seventh ground for relief. Mrs. Patti testified that she identified the incorrect person at the lineup because the petitioner was clean-shaven at the time of the robbery but had a "goatee"—hair above and below the lip—at the lineup.[11] Petitioner *now*, and for the first time, claims in his petition that he did not have a "goatee" and that the photographs taken at the time of his arrest "will verify this fact". This Court has examined the arrest photographs and they show the petitioner with a mustache—hair above the lip but not below. Further, an examination of the lineup photographs, taken the same day as the arrest, shows that the petitioner had a mustache along with two of the other three men in the lineup. However, the way the lights cast a shadow on the faces, it is not inconceivable that a witness spending a very short amount of time at the lineup, as Mrs. Patti did, about a minute, would leave with the impression that each had a tuft of hair centered just below the lower lip along with their mustaches. On the other hand, a significant observation concerning her testimony on this point is that Mrs. Patti stated that some of the men had "goatees" and some did not. An examination of the lineup photograph, as indicated above, shows that those that had hair on their faces all had mustaches. Apparently Mrs. Patti characterized what hair the men at the lineup had as a "goatee". The reasonableness of this conclusion is fortified by what transpired at the suppression

---

11. Mrs. Anjulis agrees that the petitioner was clean-shaven at the time of the robbery.

hearing where the petitioner was present and fully represented by an attorney. At that hearing Mrs. Patti was examined and cross-examined about the growth of hair which she described to be a "goatee". Nowhere in the transcript does there appear any objection to her testimony or proof that petitioner did not have the hair characterized by Mrs. Patti as a "goatee". Moreover, any contention that petitioner was not paying attention or that his attorney assumed that Mrs. Patti was right without checking with the petitioner when she may have been incorrect as to the existence of a growth of hair on petitioner's face is dispelled by what transpired between the attorney petitioner had at the suppression hearing and the petitioner when Mr. Shuman, petitioner's attorney at the lineup and preliminary hearing, was examined:

"Q. Now, Mr. Shuman, one other thing: on that lineup, the night of that lineup, did Mr. Jones have a goatee on?

A. Honestly, I can't remember this, now. May I check my notes, your Honor? I may have something in my notes.

Q. I wish you would.

THE COURT: If you have them, sure.

(At this time, Mr. Gertz turned to the defendant and asked him a question.)

THE COURT: Mr. Gertz, that was entirely out of order for you to ask the defendant the question while Mr. Shuman was standing there.

MR. GERTZ: I didn't notice that he was standing there.

THE COURT: He was standing right next to you. How could you not notice?

MR. GERTZ: I did not pay any attention to who was standing here.

Don't they usually write on here where they have lineups whether or not they have got goatees on them?

MR. HARLAN: I have never conducted a lineup, Mr. Gertz.

THE WITNESS: Your Honor, honestly, I cannot remember that situation, whether he had a goatee or not that evening."

██ Apparently the petitioner either agreed with Mrs. Patti's characterization of the growth of hair as a "goatee" or that he considered it unimportant since he did in fact have some hair at least resembling a mustache on his face. In any event the reason for the petitioner's lack of concern about Mrs. Patti's description of his mustache is now unimportant since this Court concludes that the fact petitioner and his attorney were present and aware of the issue at the suppression hearing and trial but yet did not object or make an offer of proof now bars any further resolution of the issue. See Terry v. Peyton, 433 F.2d 1016 (4 Cir. 1970) where the trial judge asked the witness some questions, later claimed by the defendant therein to be prejudicial, which were unobjected to at trial or on appeal but were raised on habeas corpus for the first time. The Fourth Circuit, in dismissing the belated claim, stated (at 1020):

"Terry's able trial counsel made no objection to the questions or the testimony. In fact, the present contention appears to have been raised for the first time before this court. It is well settled that habeas corpus may not be used as a substitute for an appeal.[1]

[1] See, e. g., Sunal v. Large, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947); Adams v. United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1943)."

Moreover, we think that counsel's failure to object, under the circumstances, amounted to a waiver of the claim now urged. . .

We should not, at this point in the proceedings, afford an opportunity to challenge evidence and tactics earlier deemed by trial counsel to be unobjectionable and sound. Under Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822,

849, 9 L.Ed.2d 837 (1962), relief may be denied a habeas applicant who,

' * * * after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures * * *'

See also United States v. Allison, 414 F.2d 407, 411 (9 Cir. 1969), cert. den., 396 U.S. 968, 90 S.Ct. 449, 24 L.Ed.2d 433 (1969); United States v. Gomez, 457 F.2d 593 (4 Cir. 1972).

Finally, this Court notes that it is not uncommon for witnesses to experience some difficulty, as Mrs. Anjulis and Mrs. Patti did, in identifying an assailant, although they ultimately are successful in doing so, when there has been a change in a significant trait or characteristic similar to petitioner's. United States v. Sherman, 421 F.2d 198 (4 Cir. 1970), cert. den., 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970); United States v. Scully, 415 F.2d 680 (2 Cir. 1969); United States v. Quarles, 387 F.2d 551 (4 Cir. 1967), cert. den., 391 U.S. 922, 88 S.Ct. 1815, 20 L.Ed.2d 659 (1968); United States v. Frazier, 417 F.2d 1138 (4 Cir. 1969), cert. den., 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427, reh. den., 398 U.S. 945, 90 S.Ct. 1850, 26 L.Ed.2d 284 (1970); United States v. Phillips, 427 F.2d 1035 (9 Cir. 1970), cert. den., 400 U.S. 867, 91 S.Ct. 108, 27 L.Ed.2d 106 (1970); United States v. Smith, 436 F.2d 787 (6 Cir. 1971), cert. den., 402 U.S. 976, 91 S.Ct. 1680, 29 L. Ed.2d 142 (1971). See also United States v. Toney, 440 F.2d 590 (6 Cir. 1971).

### H. *Period of Time Between the Robbery and the Identification*

In the eighth contention, petitioner asserts that the identifications were improperly allowed because the time between the robbery and the identification was too long. This Court, in this case, places no particular signifi-

cance on the time delay between the robbery and the initial identification of the petitioner by both witnesses since, at most, it goes to credibility and weight rather than admissibility of the witnesses' testimony. See United States v. Scully, 415 F.2d 680 (2 Cir. 1969) (34 months lapse between robbery and initial identification); United States v. Morefield, 411 F.2d 1186 (7 Cir. 1969), cert. den., 396 U.S. 916, 90 S.Ct. 238, 24 L.Ed.2d 194 (1969) (lineup held six months after the robbery deemed proper where defendant had the benefit of counsel—as in the instant case); United States v. McNair, 140 U.S.App.D.C. 26, 433 F.2d 1132 (1970) (photographic identification was made more than five months after the offense and the courtroom lineup came nearly an additional six months later). See also United States v. Toney, 440 F.2d 590 (6 Cir. 1971); United States v. Barber, 442 F.2d 517 (3 Cir. 1971), cert. den., Robinson v. United States, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971). Further, this Court does not find anything in Terry v. Peyton, *supra* (where the time issue is said to be important when a one-on-one identification is arranged immediately after the robbery); or United States v. Marson, *supra*, 408 F.2d at 651 (where the court found a six week delay in photographic identification not to be prejudicial and, therefore, was not a situation "where an identification by photographs is made shortly before trial but long after the commission of the crime which might tend to increase the chance that the photographs would be more vivid in the witnesses' minds than their recollection of the robber during the commission of the crime") cited by the petitioner in support of a contrary result, to be persuasive.

### I. *Observations That The Witnesses Had of the Robber*

With respect to the alleged lack of time the witnesses had to observe the petitioner during the course of the robbery, petitioner's ninth allegation, this Court finds as a fact, as set out

earlier, that both witnesses had ample time to scrutinize the petitioner. Not only were both witnesses plausible in their testimony as to the opportunities they had to see the robber, but also the time they had was not inordinately small. Cefalo v. Fitzpatrick, 434 F.2d 187 (1 Cir. 1970) (half-minute to a minute); Terry v. Peyton, 433 F.2d 1016, 1018 (4 Cir. 1970) (robbery took "'two to three minutes' to complete" while interior light of cab was on; witness gave a description equal in detail as in the instant case); United States v. Davis, 407 F.2d 846–847 (4 Cir. 1969) (after victim had a "fleeting glance of his assailant" he failed to identify his photographs but did identify him at the preliminary hearing); United States v. Quarles, 387 F.2d 551 (4 Cir. 1967), cert. den., 391 U.S. 922, 88 S.Ct. 1815, 20 L.Ed.2d 659 (1968) (in spite of a 3 minute robbery and in spite of defendants' masks, identifications were made); United States v. Mooney, 417 F.2d 936, 939 (8 Cir. 1969), cert. den., 397 U.S. 1029, 90 S.Ct. 1280, 25 L.Ed.2d 541, reh. den., 397 U.S. 1071, 90 S.Ct. 1507, 25 L.Ed.2d 696 (1970) ("We deem . . . [a fifteen second view over a fourteen-inch black and white television screen by a black bank teller of a white customer] sufficient time for one whose business it is to identify persons presenting checks for payment, to have retained in his memory the resemblance of the person so observed. Clearly any objection could only go to the weight of the testimony, not its admissibility, and the weight was for the jury's determination"); Cefalo v. Fitzpatrick, 434 F.2d 187 (1 Cir. 1970) (observed robber for a half-minute to a minute). Although this Court is satisfied with the witnesses' description of the robber shortly after the robbery, it is to be noted that any inability of the witnesses to give a more definite description does not deter this Court from reaching the conclusion that the witnesses had a sufficient amount of time to observe the petitioner in order to be able to make a later identification and that they did observe the petitioner during this time as they stated. The lack of a "graphic description" or even the failure to describe the assailant is not decisive since "most persons immediately after or a short time after viewing a person, particularly under circumstances that occasion an interest in his appearance, are able mentally to photographically recognize that person". Gallagher v. United States, 406 F.2d 102, 105 (8 Cir. 1969), cert. den., 395 U.S. 968, 89 S.Ct. 2117, 23 L.Ed.2d 756 (1968); Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1969) (identifying witness either gave no description or was vague about it); Vance v. North Carolina, 432 F.2d 984 (4 Cir. 1970) (witness was "somewhat vague about how the gunmen were attired, but he was emphatic in identifying the two men as the robbers from his recognition of their visages").

### J. The Claim That the "Totality of the Circumstances" Prejudiced the Pretrial and In-Court Identifications of Mrs. Patti

#### 1. The law.

Since each of the various incidents concerning the pretrial identification of petitioner by Mrs. Patti has separately hereinabove been found to be without constitutional infirmity, there is nevertheless to be decided, petitioner's tenth issue, whether the totality of the circumstances were "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law".[12] Stovall v.

12. No contention is raised by petitioner concerning any denial of counsel under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), presumably because he was represented at all stages of these proceedings. The fact that he was represented in compliance with Wade, Gilbert and Kirby, however, does not preclude a later challenge for suggestiveness under Stovall. Long v. United States, 137 U.S.App.D.C. 311, 424 F.2d 799, 803 (1969).

*Denno, supra,* 388 U.S. at 302, 87 S.Ct. at 1972. See *Simmons v. United States,* 390 U.S. 377, 388, 88 S.Ct. 967, 19 L.Ed. 2d 1247 (1968); *Foster v. California,* 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed. 2d 402 (1968); *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Vance v. North Carolina,* 432 F.2d 984 (4 Cir. 1970); *Palmer v. Peyton,* 359 F.2d 199 (4 Cir. 1966). With this in mind, and since it is clear that the lineup was conducted without constitutional infirmity, the petitioner will prevail in his attempt to exclude Mrs. Patti's testimony concerning the pretrial identification and attack her in-court identification only if he can show that the preliminary hearing, either alone or in combination with the lineup, was utilized in such a manner as to deny petitioner due process of law. See also *Clemons v. United States,* 133 U.S.App. D.C. 27, 408 F.2d 1230 (1965), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); *Terry v. Peyton,* 433 F.2d 1016 (4 Cir. 1970); *Kimbrough v. Cox,* 444 F.2d 8 (4 Cir. 1971); *United States v. Broadhead,* 413 F.2d 1351 (7 Cir. 1969), cert. den., 396 U.S. 1017, 90 S.Ct. 581, 24 L.Ed.2d 508 (1970).

In view of the recent developments in lineup law pertaining to the due process question, it is evident that "where a timely and sufficient motion is made to suppress identification testimony on the ground that it has been tainted by pretrial photographic identification procedures, it must be heard and determined by the court outside the jury's presence in the same manner as any other motion to suppress evidence alleged to be inadmissible because unlawfully obtained". *United States v. Alli-*

son, 414 F.2d 407 (9. Cir. 1969), cert. den., 396 U.S. 968, 90 S.Ct. 449, 24 L. Ed.2d 433 (1969); *Clemons v. United States, supra; United States v. Sutherland,* 428 F.2d 1152 (5 Cir. 1970); 1 Cipes, Criminal Defense Techniques at 2–37 (1971). See *Foster v. California,* 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 22 L.Ed.2d 402. The test, of course, as hereinabove indicated, used to determine at the hearing or on appeal whether or not the in-court identification is inadmissible would be that enunciated in *Stovall* and amplified in *Simmons,* 390 U.S. at pg. 384, 88 S.Ct. 967 at pg. 971— that each case is decided on its own facts and that convictions based on eyewitness identification at trial following a pretrial identification "will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." See *Foster v. California, supra,* 394 U.S. at 442 n. 2.[13] This is a two pronged test where the court is required to find the pretrial identification *both* "unnecessarily" (*Stovall*) or "impermissibly" (*Simmons*) suggestive, *and* "conducive to irreparable mistaken identification" (*Stovall*) or "gave rise to a very substantial likelihood of irreparable misidentification" (*Simmons*) before the in-court identification need be excluded. *United States ex rel. Phipps v. Follette,* 428 F.2d 912 (2 Cir. 1970), cert. den. 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970). With the test construed in this manner, it would be proper for a witness to make an in-court identification if it were determined that the in-court identification is based on observations other

---

13. Compare *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) where if an accused is denied his Sixth Amendment right to counsel at a lineup, any witness who viewed that lineup cannot identify the defendant in court unless the Government shows that "the in-court identifications had an independent source". *Stovall's* test of "ir-

reparable mistaken identification" for a due process claims and *Wade's* test of "independent source" have been equated. 1 Cipes, Criminal Defense Techniques at page 2–36 (1971); *Clemons v. United States,* 133 U.S.App.D.C. 27, 408 F.2d 1230, 1248 (1968), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). See also *Kimbrough v. Cox,* 444 F.2d 8 (4 Cir. 1971).

than those associated with improper procedures. Kimbrough v. Cox, 444 F.2d 8 (4 Cir. 1971); United States v. Sutherland, 428 F.2d 1152, 1155 (5 Cir. 1970); Foster v. California, 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 22 L.Ed. 2d 402 (1969).

■ As to the admission or non-admission of the testimony pertaining to "unnecessarily suggestive" pretrial procedures that did not give rise to a "very substantial likelihood of irreparable misidentification", as discussed in United States ex rel. Phipps v. Follette, 428 F.2d 912, 914 (2 Cir. 1970), cert. den., 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970), the Supreme Court has not specifically held that such testimony is to be *per se* excluded as was done in *Gilbert* when there has been a violation of *Wade*.[14] Prior to the *Wade-Gilbert-Stovall* trilogy the matter of an extra-judicial identification affected only the weight, not the admissibility, of the identification testimony at trial. See also United States v. Sherman, 421 F.2d 198 (4 Cir. 1970), cert. den., 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970); Vance v. North Carolina, 432 F.2d 984 (4 Cir. 1970); Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1248 (1968), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); cf. Clemons v. United States, *supra*, at 1252 (Wright, J., dissenting). However, such testimony concerning pretrial identifications conducted subsequent to *Stovall*, as was petitioner's, have been held to be *per se* excludable although the confrontation was determined to be only "impermissibly suggestive." Clemons v. United States, supra at 1248, 1252; 1 Cipes, Criminal Defense Techniques at 2–12 (1971). On this issue it appears that the Fourth Circuit does not follow the *Clemons* procedure at least where this deter-

mination has to be made when the validity of the in-court identification is raised on a later review, a situation this Court is confronted with in the instant case. Kimbrough v. Cox, 444 F.2d 8 (4 Cir. 1971). See also United States v. Davis, 407 F.2d 846 (4 Cir, 1969).

As an alternative ground for not reversing a conviction even if there was a *presentation of improper testimony concerning either the in-court or out-of-court* identification, the "test for harmlessness is whether the appellate court is 'able to declare a belief that it was harmless beyond a reasonable doubt.' Chapman v. California, 386 U.S. 18 [, 87 S.Ct. 824, 17 L.Ed.2d 705] (1967)." United States v. Cunningham, 423 F.2d 1269, 1275 (4 Cir. 1970), as cited in Terry v. Peyton, 433 F.2d 1016 (4 Cir. 1970) with respect to *Stovall* type violations; United States v. Davis, 407 F.2d 846 (4 Cir. 1969); Kimbrough v. Cox, 444 F.2d 8 (4 Cir. 1971); Cefalo v. Fitzpatrick, 434 F.2d 187 (1 Cir. 1970); United States v. Lipowitz, 407 F.2d 597, 599 (3 Cir. 1969), cert. den., Smith v. United States, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969); Long v. United States, 137 U.S.App.D.C. 311, 424 F.2d 799, 804 (1969); Monteiro v. Picard, 443 F.2d 311 (1 Cir. 1971), cert. den., 404 U.S. 1041, 92 S.Ct. 726, 30 L.Ed.2d 734 (1972); United States v. Gregg, 414 F.2d 943 (7 Cir. 1969), cert. den., 399 U.S. 934, 90 S.Ct. 2251, 26 L.Ed.2d 806 (1970). See also Holloway v. Cox, 437 F.2d 412 (4 Cir. 1971).

■ Logically then, in the Fourth Circuit, where an extra-judicial identification was improper and testimony concerning it was admitted but either its admission was harmless error or the in-court identification was based on observations other than the illegal procedures, no reversible error is manifested.

14. Where a defendant is improperly denied his right to counsel at a lineup in violation of the Sixth Amendment, Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), as applied in Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), requires there to be a *per se* exclusion of any evidence that a witness identified the defendant at that extra-judicial confrontation and where it is admitted it is reversible error unless it was harmless beyond a reasonable doubt. *Gilbert, supra,* 388 U.S. at 274, 87 S.Ct. 1951.

See Kimbrough v. Cox, *supra*. See also Terry v. Peyton, *supra;* United States v. Davis, *supra*; Vance v. North Carolina, *supra*.

2. The validity of Mrs. Patti's in-court identification.

 This Court finds as a fact and concludes as a matter of law that Mrs. Patti's in-court identification was not the product of a tainted pretrial identification procedure in that the record, as hereinabove set out, supports the conclusion that her courtroom identification was based on the events of the robbery rather than those of the subsequent confrontations with the petitioner. Vance v. North Carolina, *supra;* United States v. Butler, 405 F.2d 395 (4 Cir. 1968), cert. den., 396 U.S. 853, 90 S.Ct. 114, 24 L.Ed.2d 102 (1969); United States v. Frazier, 417 F.2d 1138 (4 Cir. 1969), cert. den., 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427, reh. den., 398 U.S. 945, 90 S.Ct. 1850, 26 L.Ed.2d 284 (1970); United States v. Toney, 440 F.2d 590 (6 Cir. 1971). See also Long v. United States, 137 U.S.App.D.C. 311, 424 F.2d 799, 804 (1969). This conclusion is grounded not only on Mrs. Patti's statement that her testimony was not the product of any suggestion, as the trial court also found, and that it was the result of her visualizations of petitioner during the robbery, see United States v. Cunningham, 423 F.2d 1269, 1275 (4 Cir. 1970); Davida v. United States, 422 F.2d 528, 531 (10 Cir. 1970), cert. den., 400 U.S. 821, 91 S.Ct. 40, 27 L.Ed.2d 49 (1970), but also, as previously discussed, on her credible testimony pertaining to the explanation of the improper identification at the lineup and on the quantum of time, found hereinabove to be adequate, during which she observed the petitioner throughout the course of the robbery. United States v. Frazier, *supra*.

3. The validity of Mrs. Patti's pretrial identification.

 Although petitioner's arguments relating to Mrs. Patti's pretrial identification have been treated seriatim, this Court is mindful of Jones' position that the totality of the circumstances were "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law", *Stovall,* and that the pretrial identifications were thereby tainted. Accordingly, the Court further finds as a fact and concludes as a matter of law that the lineup and preliminary hearing identifications and the surrounding circumstances, either separately or as a "totality", were not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification". *Simmons, supra;* United States v. Butler, 405 F.2d 395 (4 Cir. 1968), cert. den., 396 U.S. 853, 90 S.Ct. 114, 24 L.Ed.2d 102 (1969); United States v. Marson, 408 F.2d 644 (4 Cir. 1968, cert. den., 393 U.S. 1056, 89 S.Ct. 695, 21 L.Ed.2d 698, reh. den., 393 U.S. 1124, 89 S.Ct. 996, 22 L.Ed.2d 132 (1969). The petitioner does not challenge the lineup. He does challenge the confrontations at the preliminary hearing but in so doing he does not address himself to the distinction between identifications normally conducted at preliminary hearings—similar to that in which Mrs. Anjulis participated—and those that are analogous to Mrs. Patti's spontaneous recognition of petitioner. He has considered them to be one and the same. This Court believes the law to be otherwise and has so found. Accordingly, where the lineup procedure is uncontested and the preliminary hearing identification was constitutionally sufficient, this Court does not believe that together they produce a pretrial taint. Petitioner's argument in this respect is that Mrs. Patti was so influenced by the lineup that she identified petitioner at the preliminary hearing. This falls of its own weight since, if this be the case, and it is not, then no repetition identification could follow a properly conducted lineup where the defendant was not there identified. Additionally, any influence the lineup may have had on Mrs. Patti would be to taint her identification toward the man she there identified

since she testified that she did not concentrate on the remaining participants in particular other than their "goatees". But yet, the following morning, significantly, she did not bind herself to the previous identification but rather recognized petitioner spontaneously upon seeing him being brought into the hearing room. It is to be noted that nothing was done to single out the petitioner during these procedures.

The dearth of constitutional infirmities of Mrs. Patti's identifications militates against a finding that would exclude her testifying in court either concerning those events or as to whether petitioner was the robber or not. Therefore, any difficulties that she may have encountered during these procedures go only to the weight to be accorded to her testimony and not to its admissibility. United States v. Toney, 440 F.2d 590 (6 Cir. 1971); Russell v. United States, 133 U.S.App.D.C. 77, 408 F.2d 1280, 1285 (1969), cert. den., 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969). See also United States v. Peacock, 400 F.2d 992, 1001 (6 Cir. 1968), cert. den., Freeman v. United States, 393 U.S. 1025, 89 S.Ct. 635, 21 L.Ed.2d 569 (1969); Gilbert v. California, 388 U.S. 263, 272, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), discussed in Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1242 (1968), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); United States v. Hinkle, 145 U.S.App. D.C. 234, 448 F.2d 1157, 1160 (1971).

K. *Convictions Based on One Eyewitness Where Another Eyewitness's Testimony Was Improperly Admitted*

■ Were it to be found that the other teller's in-court identifications, Mrs. Anjulis', was tainted by her confrontation with petitioner at the preliminary hearing or the lineup (and this Court does not so hold) this petition would still be dismissed although the conviction would be based on the testimony of only one eyewitness. The conviction would be upheld not only on Mrs. Patti's identification but also on the undisputed corroborative evidence of William Silvers which, by itself, leaves little doubt that the pretrial identification did not lead to a misidentification.[15] United States v. Davis, 407 F.2d 846 (4 Cir. 1969).

The Fourth Circuit has had an opportunity specifically to consider convictions premised on the testimony of one eyewitness, petitioner's eleventh issue, in United States v. Levi, 405 F.2d 380, 383 (4 Cir. 1968). There it was held that one-on-one positive identification testimony to support a conviction, as in the common law, is constitutionally proper unless "the totality of the circumstances 'give[s] rise to a very substantial likelihood of irreparable misidentification'", (brackets theirs). Citing *Simmons, Stovall* and Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968). Again in United States v. Davis, *supra,* one witness was the basis for the conviction especially where, as in the instant case, there was other evidence implicating the defendant. Cefalo v. Fitzpatrick, 434 F.2d 187 (1 Cir. 1970). See Vance v. North Carolina, 432 F.2d 984 (4 Cir. 1970); Long v. United States, 137 U.S.App.D.C. 311, 424 F.2d 799 (1969); Monteiro v. Picard, 443 F. 2d 311 (1 Cir. 1971), cert. den., 404 U.S. 1041, 92 S.Ct. 726, 30 L.Ed.2d 734 (1972). This Court concludes that this conviction, even if founded on the testimony of one eyewitness, is not constitutionally insufficient.

This leaves to be considered the question of whether it is constitutionally permissible to allow a conviction to be grounded on one eyewitness's testimony and corroborative evidence of recent unexplained possession of the stolen money where there was, *arguendo,* another tainted identification introduced at trial.

15. William Silver testified that he saw the petitioner shortly after the robbery drop a quantity of money on the ground. The police recovered that money from those who retrieved it from petitioner after it was dropped. Some of it was later identified as part of the stolen money.

This must be considered in light of the lack, as this Court now finds on review of the record, of any meaningful defense or alibi offered by petitioner.[16]

In Monteiro v. Picard, 443 F.2d 311, 313 (1 Cir. 1971), cert. den., 404 U.S. 1041, 92 S.Ct. 726, 30 L.Ed.2d 734 (1972), the court was faced with a similar factual setting except that two impermissibly tainted identifications were introduced at trial along with evidence indicating that "A jury could properly find that petitioner had admitted his participation in the robbery". On this and the defendant's uncorroborated alibi (strikingly similar to Jones') the court, in upholding the conviction, stated at page 313 that:

> "The district court was correct when it found that the admissible evidence was 'almost certain to have produced a conviction.' From the record before us, we 'are able to declare a belief that [admission of the two tainted identifications] was harmless beyond a reasonable doubt.' Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969)." (brackets theirs).

And in United States v. Fried, 436 F.2d 784 (6 Cir. 1971), cert. den., 403 U.S. 934, 91 S.Ct. 2264, 29 L.Ed.2d 714 (1971), the conviction was sustained on the positive identification of the defendant by his accomplice although a witness's identification testimony may have been "constitutionally circumspect" since its admission in light of the accomplice's identification was harmless error. Similarly, see United States v. DeBose, Jr., 433 F.2d 916 (6 Cir. 1970), cert. den., 401 U.S. 920, 91 S.Ct. 906, 27 L.Ed.2d 823 (1971); Long v. United States, 137 U.S.App.D.C. 311, 424 F.2d 799 (1969). See also United States v. Cunningham, 423 F.2d 1269 (4 Cir. 1969).

This harmless error test of *Chapman* that was determinative in these cases received further definition in Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1968), where it was utilized upon review after a jury verdict, as this Court is confronted with in the instant case:

> "It is argued that we must reverse if we can imagine a single juror whose mind might have been made up because of Cooper's and Bosby's confessions and who otherwise would have remained in doubt and unconvinced. We of course do not know the jurors who sat. Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury."

*Harrington* and *Chapman* were reaffirmed in Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). There the Supreme Court held that reversal is not required "unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction". This Court finds as a fact and concludes as a matter of law that the minds of an average jury would not have found the State's case significantly less persuasive had Mrs. Anjulis' testimony as to her judicial identification been excluded, Schneble v. Florida, *supra;* since, viewed as a whole, the incriminating evidentiary value of the in-court identification was merely cumulative of the other overwhelming

---

16. Petitioner offered at trial the testimony of Watson Reed, a tenant in a neighboring apartment, for the purpose of establishing his whereabouts at the time of the robbery. However, Reed's testimony, even if believed in light of the effective cross-examination, only accounts for petitioner's actions up to 20 minutes before the robbery thereby leaving more than ample time that an examination of a local map indicates is necessary to travel the very few short blocks to the bank. Further, Reed stated that Jones told him that he, Jones, was going to his mother's house after Reed left him. However, no testimony by Jones' mother or anyone else appears in the transcript concerning where petitioner went after Reed departed.

evidence of petitioner's guilt.[17] Harrington v. California, *supra;* Schneble v. Florida, *supra;* Leake v. Cox, 432 F.2d 982 (4 Cir. 1970). See Long v. United States, 137 U.S.App.D.C. 311, 424 F.2d 799 (1969). See also United States v. Cunningham, 423 F.2d 1269 (4 Cir. 1970); Holloway v. Cox, 437 F.2d 412 (4 Cir. 1971); United States v. Johnson, 403 F.2d 1002 (6 Cir. 1968); United States v. Jordan, 466 F.2d 99 (4 Cir. 1972).

### L. Admissibility of Mrs. Anjulis' Testimony Concerning the Pretrial Identifications

This finding of harmless error is essential only if it is determined that Mrs. Anjulis' identification was improperly admitted. Although the petitioner objects, for his twelfth ground for relief, to the admissibility of testimony concerning any pretrial identification of petitioner by Mrs. Anjulis, the transcript reveals that she was not asked on direct examination whether she had previously identified petitioner. The lineup and preliminary hearing confrontations were elicited on cross-examination. Assuming, *arguendo,* that there was some impropriety in the pretrial identifications, petitioner cannot now object to what he caused to be brought out at trial especially where he knew as a result of the suppression hearing what the testimony would be. See Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1246 n. 17 (1968), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); United States v. Quarles, 387 F.2d 551 (4 Cir. 1967), cert. den., 391 U.S. 922, 88 S.Ct. 1815, 20 L.Ed.2d 659 (1968). See also Terry v. Peyton, 433 F.2d 1016 (4 Cir. 1970).

### M. Mrs. Anjulis' Identification of Petitioner at the Lineup and Preliminary Hearing

In petitioner's thirteenth contention he claims that the events leading up to Mrs. Anjulis' identification of him at the preliminary hearing and the identification itself were such as to deny him due process of law. Mrs. Anjulis' first encounter with the petitioner after the robbery was at the lineup and the fact that she failed to identify him there, as has been thoroughly discussed with respect to Mrs. Patti's identification, does not render a later identification improper. Her other confrontation with Jones occurred the morning after the lineup at the preliminary hearing when the petitioner was before the judge, in custody, with his attorney and four or more other black men. Jones claims that this environment was such as to show that the state was saying "that's the man". For further support he alleges that the time delay between the robbery and this identification was prejudicial and that the observations that Mrs. Anjulis had of the robber make it unlikely that she could recall his appearance three months later. Both of these latter issues were raised earlier and, for the reasons stated there, this Court finds them to be without constitutional substance in light of Mrs. Anjulis' ample opportunity to observe the robber.

This leaves open for consideration the efficacy of the events at the preliminary hearing itself. In United States v. Cole, 449 F.2d 194 (8 Cir. 1971), cert. den. Woodard v. United States, 405 U.S. 931, 92 S.Ct. 987, 30 L.Ed.2d 806 (1972), that Court, on circumstances similar to Jones' identification, adequately expressed the view that this Court believes

---

17. It need not here be decided whether such other evidence of petitioner's guilt can be considered in determining whether the in-court testimony was conducive to irreparable mistaken identification or whether such evidence can be considered only as demonstrating harmless constitutional error as defined in *Chapman* since taking the view most favorable to Jones the admission of the testimony was harmless error beyond a reasonable doubt. United States ex rel. Phipps v. Follette, 428 F.2d 912 (2 Cir. 1970), cert. den., 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

to be a proper solution for this issue (at 199):

"Ruth Bowman was the teller at a drive-in window of the Community State Bank. At the time of the robbery she saw a white Ford Galaxie pass by her window and 'glanced' at the driver of the vehicle. She testified that she wrote down the license number of the car. She noticed the driver was a Negro and 'very thin.' She did not participate in any police lineups. The preliminary hearing was the first occasion at which she was called on to make an identification.

"At the time of trial, the district court held a hearing out of the presence of the jury to determine whether the witness' identification was in any way based on illegal procedure. The defendant claimed that at the preliminary hearing he was the only Negro *seated with this counsel* in front of the rail in the courtroom. Mrs. Bowman stated she did not know that the preliminary hearing was called for McHenry. However, she admitted she saw McHenry and his counsel called forward and knew he was being accused of the crime. During the preliminary hearing she was asked whether anyone in the courtroom resembled the driver. She pointed out McHenry.

"The trial court ruled that Mrs. Bowman's in court testimony 'can well be based on her observations that she made at the time of the bank robbery, and there is as yet no suggestion she is basing it on anything that occurred in the hearing * * *.' She was allowed thereafter to testify. . . .

"Here McHenry was represented by counsel throughout the preliminary hearing. The record fails to demonstrate any complaint made by defendant's counsel at the time of the preliminary hearing. Counsel for the defense had ample opportunity to attack Mrs. Bowman's foundation to make identification at trial. At trial counsel pursued such an examination. Defendant relies on the language of Stovall v. Denno, supra:

'The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it * * *.' 388 U.S. at 302, 87 S.Ct. at 1972.

"See also Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Thus, defendant's main thrust here is that the preliminary hearing resembles the one man show-up and violates due process. Cf. Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968).

"Each case stands on its own footing. There exists no per se rule excluding a witness' identification made while counsel is present. The trial court may weigh all the attendant circumstances of the challenged identification. Consideration can be given to counsel's opportunity to inquire into circumstances of the challenged identification which existed at the time of the preliminary hearing. Of greater significance is whether the trial court is persuaded that the witness' identification at time of trial rests solely on the suggestive 'show-up' or is based on independent origin. Although a police lineup might have obviated the objection made here, nevertheless the essential issue here, as in *Stovall*, . . . is whether the confrontation procedure was so impermissively suggestive as to give rise to a very substantial likelihood of irreparably mistaken identification. The trial court found no suggestive illegality. We find no basis on the present record to hold that this finding is incorrect."

As in the *Cole* case, the trial court below found no suggestive illegality, and this Court finds no basis on the

present record to hold either that this finding is incorrect or that there was a misapplication of federal constitutional law by that Court in finding that the "totality of the circumstances" was not "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law". *Stovall, supra.*

### N. *Mrs. Patti's Pressuring of Mrs. Anjulis to Identify Petitioner*

■ Petitioner's last argument in favor of excluding Mrs. Anjulis' pretrial identification, his fourteenth issue, is grounded on Mrs. Patti's statement to Mrs. Anjulis at the time petitioner was brought into the hearing room. When Mrs. Patti first observed petitioner she said to Mrs. Anjulis—"that's the man". Petitioner claims that Mrs. Anjulis heard it and was thereafter pressured into identifying petitioner. Even assuming that she did hear the comment, in view of this Court's finding that her testimony was not only unnecessary to convict but also that its admission was harmless error, no objection can now be heard as to the effect, if any, of the comment on Mrs. Anjulis' identification.

Moreover, this Court has also determined from an examination of the record that no constitutional infirmity surrounds Mrs. Anjulis' preliminary hearing identification and this finding is not altered by Mrs. Patti's comment since it is clear from the transcript, as discussed earlier, that Mrs. Anjulis did not hear, or at least did not understand, the comment—a phenomenon that is not uncommon—and, therefore, was not "pressured" or influenced by it. United States v. Marson, 408 F.2d 644, 651 (4 Cir. 1968), cert. den., 393 U.S. 1056, 89 S.Ct. 695, 21 L.Ed.2d 698, reh. den., 393 U.S. 1124, 89 S.Ct. 996, 22 L.Ed.2d 132 (1969); Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1240 (1968), cert. den., 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); United States v. Cunningham, 423 F.2d 1269, 1273 (4 Cir. 1970).

### O. *Mrs Anjulis' In-Court Identification of Petitioner*

■ Standing alone, the in-court identification of petitioner by Mrs. Anjulis, petitioner's fifteenth claim, also passes constitutional muster. She had a clear opportunity to observe the robber, the time was adequate to acquire a sufficient memory of his features and the distance was not such as to cast any doubt on her identification. Finally, as with Mrs. Patti, she was positive of her judicial identification and that it was not a product of suggestion. United States v. Cunningham, *supra.*

### P. *The Maryland Law*

As a last gasp petitioner asserts, for his sixteenth position, that under "Maryland law" he would be entitled to relief. An immediate observation about this statement is that he is in federal court because Maryland courts have determined that he was properly convicted under Maryland law. Apparently, what petitioner actually contends is that, if he could have appealed the admission of the identification testimony, that testimony would have been found on the merits to have been tainted and, therefore, would be grounds for post conviction relief. For support he cites Coleman v. State, 8 Md.App. 65, 258 A.2d 42 (1969), where an identification at a preliminary hearing similar to Mrs. Anjulis' was determined to be prejudicial. No decision as to whether *Coleman* does in fact require exclusion of evidence procured through a procedure resembling Mrs. Anjulis' need be made since the comparison between the *Coleman* identification and that of Mrs. Anjulis', although very similar in many respects, differs in a material and determinative respect—the presence of an attorney. In *Coleman* there was none whereas Jones was represented. This is a significant enough departure from the *Coleman* facts as to negate any further consideration of the identification in that case. However, it is also to be noted that the challenged identification in *Coleman* was

the only evidence to establish that Coleman perpetrated the crime—a situation dissimilar to the instant case. Coleman v. State, 8 Md.App. 65, 72, 258 A.2d 42 (1969).

Moreover, the Court of Special Appeals of Maryland in Layman v. State, 14 Md.App. 215, 286 A.2d 559 (1972), approved a spontaneous identification, resembling Mrs. Patti's, and specifically held *Coleman* to be inapplicable to such procedures. The *Coleman* case is no help to petitioner.

Petitioner's seventeenth and eighteenth claims that the in-court identification had no independent source and that the admission of any of the identification testimony was not harmless error have been resolved above.

For the reasons stated, this petition is dismissed.

Leave to file in forma pauperis has heretofore been granted.